FILED
Case 1:08-cv-00366    Document 1    Filed 01/16/2008    Page 1 of 63    BR

JAN 1 6 2008
Jan 16 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FRED PLAMBECK AND SUSAN
PLAMBECK,

                                  Plaintiffs,

    v.

MID-WEST NATIONAL LIFE
INSURANCE COMPANY OF
TENNESSEE,

                                  Defendant.

08CV366
JUDGE DARRAH
MAGISTRATE JUDGE NOLAN

U. S. District Court Judge

### NOTICE OF REMOVAL OF CAUSE

Defendant Mid-West National Life Insurance Company of Tennessee ("Mid-West"), pursuant to 28 U.S.C. §1446 and the Local Rules of the United States District Court, Northern District of Illinois, notifies this Honorable Court that the above-entitled cause has been removed from the Circuit Court of Cook County, Illinois, Municipal Division (transferred to law), and in support of said notice states as follows:

### BACKGROUND

Plaintiffs Fred and Susan Plambeck ("Plaintiffs") commenced this action by filing and then serving a copy of the Summons and Complaint on the Illinois Department of Financial and Professional Regulation, Insurance Division on June 14, 2007. (A copy of the Summons and Complaint is attached hereto as **Exhibit A.**) The Complaint alleges a breach of contract claim for damages in the amount of $31,740.42 for payment of denied health care costs under a health insurance policy issued to Plaintiffs by Mid-West and seeks a statutory penalty of $60,000 or 60% of the award, in this case 60% of $31,740.42 or $19,044.25 and attorneys' fees. Mid-West denies that it is liable to Plaintiffs for any of the relief sought in their Complaint.

On August 24, 2007, Mid-West filed and served its answer, affirmative defenses and counterclaim for equitable rescission to Plaintiffs' Complaint. (A copy of Mid-West's answer, affirmative defenses and counterclaim to Plaintiffs' Complaint is attached hereto as **Exhibit B.**) On December 18, 2007, Plaintiffs served their answer to Mid-West's counterclaim, admitting that the amount in controversy in this matter exceeds $75,000.00 and that Mid-West rescinded the health coverage issued to Plaintiffs, resulting in the denials of their health care benefit claims. (A copy of Plaintiff's answer to Mid-West's affirmative defenses and counterclaim is attached hereto as **Exhibit C.**)

## GROUNDS FOR REMOVAL

**A.    This Court Has Diversity Jurisdiction Over This Matter.**

A state court action may be removed to a Unites States District Court where such District Court has original jurisdiction. 28 U.S.C. §1441. In the present matter, original jurisdiction exists pursuant to 28 U.S.C. §1332, which provides in pertinent part:

> \*\*\*
>
> (a)    The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between -
> \*\*\*
>
> (1)    Citizens of different States[.]

28 U.S.C. §1 332(a)(1)

Plaintiffs' Complaint was not removable on its face and Mid-West could not remove based on a defense to the claims. Based on Plaintiffs' admissions to the amount in controversy, however, as set forth in their answer to Mid-West's counterclaim, as well as to the fact that Mid-West rescinded the coverage, as such admitting that the validity of the contract is at issue in this

415044.1

matter establish as of receipt of the answer to the counterclaim that this Court has diversity jurisdiction over this matter.

### 1.     The Amount in Controversy exceeds $75,000

Receipt of an "amended pleading, motion, order or other paper, through service or otherwise, from which it may first be ascertained that the case is one which is or has become removable" triggers the 30 day removal period pursuant to 28 U.S.C. §1446(b). The Eighth Circuit in *In re* Willis, 228 F.3d 896 (8th Cir. 2000) explained as follows:

> We find the thirty-day time limit of Section 1446(b) begins running upon receipt of the initial complaint only when the complaint explicitly discloses the plaintiff is seeking damages in excess of the federal jurisdictional amount. This rule 'promotes certainty and judicial efficiency by not requiring courts to inquire into what particular defendant may or may not subjectively know.' Further, this rule prevents a plaintiff from disguising the amount of damages until after the thirty-day time limit has run to avoid removal to federal court. We therefore grant the petition for mandamus and direct the district court to reassume jurisdiction of the case and reinstate the case on its docket.

*Id.*

The answer to Mid-West's counterclaim is such paper, triggering based on the admission to the amount in controversy exceeding $75,000 the removal period. (Ex. C at p. 3, Answer to Counterclaim ¶3.) As Plaintiffs also admitted Mid-West's rescission of the insurance coverage, thus necessarily demanding reinstatement of the rescinded coverage prior to payment of the outstanding claims pursued in their Complaint, the face value of the policy must be considered in determining the amount in controversy in this action. *See Keck v. Fid. & Cas. Co. of N.Y.*, 359 F.2d 840, 841 (7th Cir. 1966); *Mass. Cas. Ins. Co. v. Harmon*, 88 F. 3d 415 416 (6th Cir. 1996) (the value of future benefits under a disability policy is considered in determining the jurisdictional amount where the validity of the policy is at issue); *Campbell v. Equitable Life Assurance Soc'y of the United States*, 1995 U.S. App. LEXIS 24658 (6th Cir. 1995) (considering

3

415044.1

value of future benefits when validity of policy was at issue); *Stengrim v. Northwestern Mut. Life Ins. Co.*, 2004 U.S. Dist. LEXIS 21531, at *5-10 (D. Minn. 2004) (Kyle, J.).

As the face value is $1,000,000 (*see* policy attached to Ex. B), the amount in controversy is met.

**2.    *This Action is between Citizens of Different States.***

Plaintiffs admitted in their answer to Mid-West's counterclaim that complete diversity exists between the parties.    (Ex. C at p. 3, ¶¶ 1-2 (answer to counterclaim.)) Accordingly, complete diversity between the parties existed at the time Plaintiff filed her Complaint and diversity jurisdiction exists now.

## CONCLUSION

For all of the above reasons, this Court has original jurisdiction over this action under 28 U.S.C. §1332. Mid-West is entitled to remove this action to this Court pursuant to 28 U.S.C. §§1331, 1332, and 1441. In compliance with 28 U.S.C. § 1446(b), this Notice of Removal is filed with this Court within thirty (30) days after this case became removable. A copy of this Notice of Removal will be filed with the Clerk of the Municipal Court in Cook County, Illinois and served upon all adverse parties as required by 28 U.S.C. §1446(d).

WHEREFORE, Defendant Mid-West National Life Insurance Company of Tennessee notifies that this cause has been removed from the Municipal Court in Cook County, Illinois, to the United States District Court for the Northern District of Illinois pursuant to the provisions of 28 U.S.C. § 1446 and the Local Rules of the United States District Court for the Northern District of Illinois.

4

Respectfully submitted,

MID-WEST NATIONAL LIFE INSURANCE
COMPANY OF TENNESSEE, Defendant

By: _____
        One of its attorneys

Daniel J. McMahon
Edna S. Bailey
WILSON, ELSER, MOSKOWITZ,
   EDELMAN & DICKER LLP
120 North LaSalle Street, Suite 2600
Chicago, IL 60602
(312) 704-0550
(312) 704-1522

415044.1

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that a true and correct copy of the above and foregoing pleading was deposited in the U.S. Mail, enclosed in an envelope properly addressed to:

***Attorney for Plaintiff***
Douglas K. Morrison
MORRISON & MIX
Suite 2750
120 N. LaSalle Street
Chicago, Illinois 60603
(312) 726-0888

Before the hour of 5:00 p.m. this 16th day of January, 2008.

*Edna Bailey*

Edna S. Bailey

415044.1

2120 - Served    2220 - Not Served      2620 - Sec. of State
2121 - Alias Served    2221 - Alias Not Served    2621 - Alias Ser. of Service
**Summons** (This form replaces CCM 0646, CCM1 0646, CCM1 0651, CCM0 0648, and CCMD 0649-2 thru 6)      **CCM N649-60M-9/15/06 (**                    **)**

### IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### _FIRST_ MUNICIPAL DISTRICT

**Name All Parties**

FRED PLAMBECK and SUSAN PLAMBECK
_____
                          **Plaintiff(s)**

v.

MID-WEST NATIONAL LIFE INSURANCE
_____
COMPANY OF TENNESSEE        **Defendant(s)**
c/o Illinois Division of Insurance
100 W. Randolph St., Suite 9-301
_____
Chicago, IL  60601        **Address of Defendant(s)**

Case No. _____

Amount Claimed: $ 39,675.53 plus costs

Appearance Filing/Return Date:  7/12/07

Status Date: _____

Trial Date: _____

Time: _____ Room: _____

### SUMMONS

**To each Defendant:**

**YOU ARE SUMMONED and required:**

**1. To file your written appearance by yourself or your attorney and pay the required fee in:**

☑ **District 1:** Richard J. Daley Center; 50 West Washington, Room 602; Chicago, IL 60602
☐ **District 2:** 5600 Old Orchard Rd., Rm 136; Skokie, IL 60077      ☐ **District 5:** 10220 S. 76th Ave., Rm 121; Bridgeview, IL 60455
☐ **District 4:** 1500 Maybrook Dr., Rm 236; Maywood, IL 60153

on ___July 12_____, _2007_____, between the hours of 8:30 a.m. and 2:30 p.m.;

☐ **District 3:** 2121 Euclid, Rm 121; Rolling Meadows, IL 60008      ☐ **District 6:** 16501 S. Kedzie Pkwy., Rm 119; Markham, IL 60428
on _____, _____, before 9:00 a.m.

**2. File your answer to the complaint before 9:00 a.m. as required by the applicable subsections of Paragraph 3 or 4 in the NOTICE TO THE DEFENDANT on the reverse side.**

**IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF ASKED IN THE COMPLAINT, A COPY OF WHICH IS HERETO ATTACHED.**

**To the officer:**

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service, and not less than 3 days before the day for appearance. If service cannot be made, this summons shall be returned so endorsed.

This summons may not be served later than 3 days before the day for appearance.

**THERE WILL BE A FEE TO FILE YOUR APPEARANCE. SEE FEES ON THE REVERSE SIDE OF THIS FORM.**

Atty. No.: 17557_____

Name: Douglas K. Morrison of MORRISON & MIX

Atty. for: Plaintiffs

Address: 120 N. La Salle Street, Suite 2750

City/State/Zip: Chicago, Illinois  60602

Telephone: (312) 726-0888

WITNESS, _____, _____

_____
**DOROTHY BROWN, Circuit Court Clerk**

Date of Service: _____
(To be inserted by officer on copy left with defendant or other person)

\*\* Service by Facsimile Transmission will be accepted at:
_____
(Area Code)    (Facsimile Telephone Number)

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
ORIGINAL COURT FILE

**SEE REVERSE SIDE**

EXHIBIT
**A**



# Illinois Department of Financial and Professional Regulation

## Division of Insurance

ROD R. BLAGOJEVICH
Governor

DEAN MARTINEZ
Secretary

MICHAEL T. McRAITH
Director
Division of Insurance

June 15, 2007

Mid-West National Life Insurance
   Company of Tennessee
9151 Grapevine Highway
North Richland Hills, Texas  76180

     Re:  Case Number:  2007  1158507

Gentlemen:

     Enclosed please find copy of Summons and Complaint served on me as your agent for service of process on June 14th at 10:00 a.m. at my Chicago Office in the case of Fred Plambeck and Susan Plambeck, vs. your company.

                 Sincerely,

                 Michael T. McRaith
                 Director

**RECEIVED**

JUN 1 9 2007

**CORP. LEGAL**

MTM:BAB:msc
Encl.

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
MUNICIPAL DEPARTMENT, FIRST DIVISION

2007L158507
CALENDAR/ROOM 1106
TIME 09:30
Breach of Contract

FRED PLAMBECK and SUSAN
PLAMBECK,

        plaintiffs,

    vs.

MID-WEST NATIONAL LIFE
INSURANCE COMPANY OF TENNESSEE,

        defendant.

)
)
)
)
)
)
)
)
)
)
)

No.

Amount claimed: **$39,675.53**
plus fees and costs

## COMPLAINT

FRED PLAMBECK and SUSAN PLAMBECK, plaintiffs, complain of MID-WEST

NATIONAL LIFE INSURANCE COMPANY OF TENNESSEE, and state as follows.

### Count I

1. Plaintiffs are adult residents of Illinois.

2. Defendant is an insurance company, licensed to do business in Illinois and

engaged in business in Cook County.

3. On about June 15, 2005, plaintiff Fred Plambeck submitted an application to

defendant for health, vision, and dental insurance coverage. All representations con-

tained in said application were true and accurate.

4. Pursuant to said application, defendant issued certificates of insurance, effec-

tive June 21, 2005, to plaintiff for health (no.0204375799), vision (no. 02414375799),

and dental (no. 02444375799) family coverage. Despite requests by plaintiffs, defen-

RECEIVED
STATE OF ILLINOIS

JUN 1 2007

DEPT. OF INSURANCE
CHICAGO, ILLINOIS

dant failed to provide plaintiffs with a copy of the policies; thus, no copy is attached to this complaint.

5. Both plaintiffs were covered under these policies of insurance.

6. Plaintiffs duly and timely paid all premiums for such policies during the entire relevant period herein.

7. During the period of coverage, plaintiffs duly and properly (directly and through their providers) submitted claims to defendant for health insurance benefits for covered medical expenses incurred during the policy period, aggregating the sum of $31,740.42.

8. In breach of its obligations under the health insurance policy, defendant failed and refused to pay any of the plaintiffs' claims.

9. Due to said breaches, plaintiffs have been injured in the amount of $31,740.42.

WHEREFORE, plaintiffs request judgment against defendant with damages in the amount of $31,740.42 plus costs.

<u>**Count II**</u>

1-9. Plaintiffs repeat and reallege paragraphs 1 through 9 of Count I as and for paragraphs 1 through 9 of Count II.

10. In denying the plaintiffs' claims for benefits under the policy, defendant employed pretext by relying on reasons for denial that it knew or reasonably should have known to be untrue.

2

11.  Such conduct by defendant amounts to vexatious and unreasonable delay in settling plaintiffs' claims, thereby entitling plaintiffs to additional statutory damages against defendant pursuant to 215 ILCS 5/155.

WHEREFORE, plaintiffs request judgment against defendant with damages in the amount of $39,675.53, plus attorney fees and costs.

*PLAINTIFFS DEMAND TRIAL BY JURY.*

FRED PLAMBECK and SUSAN
PLAMBECK, plaintiffs,

by _____
One of their attorneys

Douglas K. Morrison
MORRISON & MIX
Suite 2750
120 North La Salle Street
Chicago, Illinois 60602
312-726-0888
Attorney no. 17557

3

## **CERTIFICATION**

Under penalties as provided by law pursuant to section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matter the undersigned certifies as aforesaid that (s)he verily believes the same to be true.

4



Illinois Department of
Financial and Professional Regulation
320 West Washington Street
Springfield, Illinois 62786

Illinois Division of Insurance

LEGAL CORP
Level #:
LEVEL 6

06/19/07 15:08

RECEIVED

JUN 1 9 2007

CORP. LEGAL

Mid-West Nat. LIC of Tennessee
9151 Grapevine Highway
N. Richland Hills, TX 76180



06890.00004                                                                                    #16741

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
FIRST MUNICIPAL DISTRICT

| | | |
|---|---|---|
| Fred Plambeck and Susan Plambeck, | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 2007-M1-158587 |
| The Mid-West National Life Insurance Company Of Tennessee, | ) | |
| Defendant. | ) | |

## DEFENDANT'S ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIM FOR EQUITABLE RESCISSION TO PLAINTIFFS' COMPLAINT

Defendant The Mid-West National Life Insurance Company of Tennessee ("Mid-West"),

by its undersigned counsel, for its Answer, Affirmative Defenses and Counterclaim to Plaintiffs

Fred and Susan Plambeck's ("Plaintiffs") Complaint, states as follows:

## COUNT I

1.     Plaintiffs are adult residents of Illinois.

**ANSWER:**     Mid-West neither admits nor denies the allegations in ¶ 1 of Plaintiffs'

Complaint.

2.     Defendant is an insurance company, licensed to do business in Illinois and
engaged in business in Cook County.

**ANSWER:**     Mid-West admits the allegations in ¶ 2 of Plaintiffs' Complaint.

3.     On about June 15, 2005, plaintiff Fred Plambeck submitted an application to
defendant for health, vision, and dental insurance coverage. All representations contained in said
application were true and accurate.

**ANSWER:**     Mid-West admits that on June 15, 2005, Plaintiffs both signed and dated

an application for health insurance for themselves and their daughter Megan Chartier, including,

413547.1

among others, vision and dental benefits, under group insurance policy No. 00401 issued to policyholder Alliance for Affordable Services by Mid-West and denies any and all remaining allegations set forth in ¶ 3 of Plaintiffs' Complaint.

4.      Pursuant to said application, defendant issued certificates of insurance, effective June 21, 2005 to plaintiff for health (no. 0204375799), vision (no. 0241437599), and dental (no. 02444375799) family coverage. Despite requests by plaintiffs, defendant failed to provide plaintiffs with a copy of the policies; thus, no copy is attached to this complaint.

**ANSWER:**    Mid-West admits that on June 21, 2005, it issued Basic Hospital/Medical-Surgical Expense Certificate No. 02404375799, Group Dental Insurance Certificate No. 02444375799 and Vision Insurance Certificate No. 02414375799, covering primary insured Plaintiff Fred Plambeck and dependents Plaintiff Susan Plambeck and Megan Chartier. Mid-West denies any and all remaining allegations set forth in ¶ 4 of Plaintiff's Complaint except that it admits that a copy of the certificates was not attached to Plaintiffs' Complaint despite Mid-West having provided Plaintiffs with same on June 23, 2005.

5.      Both plaintiffs were covered under these policies of insurance.

**ANSWER:**    Mid-West admits that the certificates issued covered both Plaintiffs and Megan Chartier until the coverage was rescinded due to material misrepresentations on their application for insurance, rendering all certificates void *ab initio.*

6.      Plaintiffs duly and timely paid all premiums for such policies during the entire relevant period herein.

**ANSWER:**    Mid-West admits that Plaintiff timely made their premium payments until the coverage was rescinded due to material misrepresentations on their application for insurance, rendering all certificates void *ab initio.*

7.      During the period of coverage, plaintiffs duly and properly (directly and through their providers) submitted claims to defendant for health insurance benefits for covered medical expenses incurred during the policy period, aggregating the sum of $31,740.42.

413547.1

**ANSWER**:     Mid-West denies the allegations set forth in ¶ 7 of Plaintiff's Complaint.

8.     In breach of its obligations under the health insurance policy, defendant failed and refused to pay any of the plaintiffs' claims.

**ANSWER**:     Mid-West denies the allegations set forth in ¶ 8 of Plaintiffs' Complaint except that it admits that it denied claims for medical expenses submitted due to rescission of the certificates of coverage.

9.     Due to said breaches, plaintiffs have been injured in the amount of $31,740.42.

**ANSWER**:     Mid-West denies the allegations set forth in ¶ 9 of Plaintiff's Complaint.

## COUNT II

1-9.     Plaintiffs repeat and reallege paragraphs 1 through 9 of Count I as and for paragraphs 1 through 9 of Count II.

**ANSWER**:     Mid-West restates and realleges its answers to ¶¶ 1 through 9 of Plaintiffs' Complaint as if fully set forth herein.

10.     In denying the plaintiffs' claims for benefits under the policy, defendant employed pretext by relying on reasons for denial that it knew or reasonably should have known to be untrue.

**ANSWER**:     Mid-West denies the allegations set forth in ¶ 10 of Plaintiff's Complaint.

11.     Such conduct by defendant amounts to vexatious and unreasonable delay in setting plaintiffs' claims, thereby entitling plaintiffs to additional statutory damages against defendant pursuant to 215 ILCS 5/155.

**ANSWER**:     Mid-West denies the allegations set forth in ¶ 11 of Plaintiff's Complaint.

WHEREFORE, Mid-West requests that this Court enter judgment in its favor and against Plaintiff and award to Mid-West such other and further relief as this Court deems just and equitable including, but not limited to, an award to Mid-West of its reasonable costs in defending this action.

413547.1

## AFFIRMATIVE DEFENSES

## FIRST AFFIRMATIVE DEFENSE

### (Misrepresentation)

1.    At all relevant times, Mid-West underwrote group insurance benefits provided to members of the Alliance for Affordable Services, incident to their membership.

2.    On or about June 15, 2005, Plaintiffs applied for health, dental and vision coverage by providing answers to specific questions and finally signing an application for coverage. ("Application")  A true and correct copy of the Application is attached to this pleading as Exhibit A ("Ex. A.")

3.    In completing the Application, Plaintiffs answered "No" to the following question:

> 17.    Have you or any Applicant EVER had symptoms, been diagnosed, received medical advice or been treated for (if "Yes," circle applicable condition):
>
> (l) back, spine, arm or leg disorder or arthritis, gout, bursitis or neuritis?

4.    Plaintiffs answered "Yes" to the following question:

> 18.    Any other medical or surgical advice, hospitalizations, treatment, operations, or testing in the last five (5) years?

5.    In response to Question 19, which requests: 'Give complete details of all "Yes" answers to Questions 17 through 18' Plaintiffs disclosed the following information:

4

| Name | Nature of Illness or Accident (Include Diagnosis, Operations, and Medications) | Date Started | Date Stopped | Operation | Hospitalized | Doctor's Name and Address |
|---|---|---|---|---|---|---|
| Dr. Banks Susan Plambeck | had hysterectomy | 3-10-05 | 3-14-05 | ☒ Yes ☐ No | ☒ Yes ☐ No | Dr. Vance 847-382-2320 7640 W Hwy 22 Barrington IL 60010 |
| | | | | ☐ Yes ☐ No | ☐ Yes ☐ No | |
| | | | | ☐ Yes ☐ No | ☐ Yes ☐ No | |
| | | | | ☐ Yes ☐ No | ☐ Yes ☐ No | |
| | | | | ☐ Yes ☐ No | ☐ Yes ☐ No | |
| If additional space is needed, use separate paper to record complete information with signature of Applicant. | | | | | | |

6.    Plaintiffs made no other disclosures regarding any health conditions, treatment, surgery or medications on the Application for Coverage.

7.    In reliance upon the information provided on the Application and in the belief that the information was true and complete, Mid-West approved Plaintiffs and their daughter for coverage and underwrote and issued Basic Hospital/Medical-Surgical Expense Certificate No. 02404375799, Group Dental Insurance Certificate No. 02444375799 and Vision Insurance Certificate No. 02414375799 (collectively "Certificates") on June 21, 2005. True and correct copies of the Certificates are attached to this pleading as Exhibit B (Ex. B").

8.    Within two years of the effective dates of the Certificates, Plaintiffs submitted a number of claims for insurance coverage for medical services received.

9.    During a routine pre-existing condition review within the two-year contestability period pursuant to the Certificates of Insurance, Mid-West requested medical records from Plaintiff's primary care and other treating physicians.

10.    The medical records revealed that Plaintiff Susan Plambeck experienced abdominal pain in the lower right quadrant and went to the emergency room on January 25, 2005. The CT scan results showed a small cyst in the right lobe of her liver, previous cholecystectomy, cystic areas of lower uterine segment, compatible with nabothian cysts and

5

thickening of the wall of the sigmoid colon without standing or abscess formation yet possibly indicative of mild diverticulosis.

11.    A follow up visit on January 27, 2005 indicated that Plaintiff Susan Plambeck suffered from Sicca syndrome.

12.    On February 3, 2005, a CT scan of Plaintiff Susan Plambeck's abdomen and pelvis revealed diverticulosis. A colonoscopy performed on February 5, 2005 ruled out inflammatory bowel disease. On February 9, 2005, Plaintiff Susan Plambeck underwent an upper endoscopy due to bile reflux.

13.    On February 4, 2005, Plaintiff Susan Plambeck underwent MRI's of her thoracic and lumbar spine due to right flank pain. The thoracic MRI revealed evidence of mild anterior spurring and disc bulging in her mid to lower thoracic region consistent with mild degenerative arthritic change. The lumbar MRI indicated disc bulging at L2-3, L4-5, L5-S1 and minimal spurring of postero-inferior corners of L4 and L5.

14.    Plaintiff Susan Plambeck further underwent an MRI of her neck due to left parotid swelling and inflammation or infection in the left parotid gland.

15.    On April 5, 2005, Plaintiff Susan Plambeck presented for neck pain and headaches and underwent a cervical spine x-ray, which was normal.

16.    On April 15, 2005, Plaintiff Susan Plambeck again presented for neck pain and on May 27, 2005 for headaches.

17.    Plaintiffs' treating physician, Dr. Daniel R. Di Iorio, confirmed that the February 4, 2005 MRI findings had been discussed with Plaintiff Susan Plamback, who attempted conservative treatment including physical therapy and chiropractic care.

6

18.    Plaintiffs did not disclose any of Plaintiff Susan Plambeck's procedures, follow-ups, treatment and medical conditions described in paragraphs 10 through 16 on the Application for Coverage they completed and executed on June 15, 2005.

19.    Plaintiffs knowingly made material misrepresentations and/or knowingly withheld material information concerning Plaintiff Susan Plambeck's medical history on their Application for health insurance coverage with the actual intent to deceive Mid-West and for the purpose of inducing Mid-West to act favorably on their Application.

20.    In underwriting and issuing health insurance coverage to Plaintiffs, Mid-West relied on the belief that Plaintiffs had truthfully completed the Application and had disclosed their complete medical history on their Application.

21.    Plaintiffs' non-disclosure and misrepresentation of Plaintiff Susan Plambeck's medical history materially affected the risk or the hazard assumed by Mid-West in underwriting and issuing health insurance coverage to Plaintiffs.

22.    Had Mid-West known the true facts concerning Plaintiff Susan Plambeck's complete medical history at the time Plaintiffs applied for coverage, it would only have approved the coverage with execution of waiver No. H1740 covering any treatment relative to Plaintiff Susan Plambeck's thoracic spine and waiver No. H1746 covering any treatment relative to Plaintiff Susan Plambeck's lumbar spine.  Mid-West would not have issued the coverage that was issued.

23.    Had Mid-West known that MRI's of Plaintiff Susan Plambeck's thoracic and lumbar spine indicated disc bulging in mid to lower thoracic area and disc bulging at L2-3, L4-5, L5-S1 and spurring of postero-inferior corners of the L4 and L5 vertebra, it would not have

7

approved Plaintiffs for coverage without execution of waivers Nos. H1740 and 1746 and would

not have issued the coverage that was issued.

24.    The Application completed and signed by Plaintiffs provides, in relevant part:

I agree that (a) all statements and answers in this Application are true to the best
of my knowledge and belief; (b) this Application will form a part of the contract;
(c) the agent does not have the authority on behalf of the Company to accept the
risks, or to make, alter or amend the coverage or to extend the time for making
any payment due on such coverage and (d) no insurance will take effect unless
and until the Application is approved by the Company and the policy/certificate is
delivered to the Applicant while the conditions affecting the insurability are and
have remained as described herein and the first premium has been paid in full.

*See* Ex. A at p. 2.

25.    The Policy contains the following provisions:

After 2 years from the Insured Person's Effective Date of Coverage, no
misstatements, except fraudulent misstatements, made in the enrollment
application will be used to void the coverage, or deny a claim *unless the loss was
incurred during the first 2 years following such Insured Person's Effective Date
of Coverage.*

*See* Ex. B at p. 19 (emphasis added)

26.    On February 6, 2006, Mid-West advised Plaintiffs of the material

misrepresentations on the Application for insurance, inducing it to issue coverage. A true and

correct copy of Mid-West's February 6, 2006 correspondence is attached hereto as Exhibit C

("Ex. C.") In that letter, Mid-West further advised Plaintiffs that if it had been aware of Plaintiff

Susan Plambeck's previous medical history, the Certificate would have only been issued with

Administrative Endorsements for her thoracic and lumbar spine. Mid-West requested that

Plaintiffs execute the Administrative Endorsements enclosed with the correspondence by

February 27, 2006 or it would rescind coverage and refund the premium paid less any claims

previously paid by Mid-West. *See* Ex. C.

8

27.    On February 21, 2006, Plaintiffs responded and requested a copy of the medical records Mid-West reviewed. Plaintiffs indicated that if the records indicated treatment for bulging disc, they would sign the Endorsement.

28.    On April 24, 2006, Mid-West requested that Plaintiffs sign a release authorizing it to do so pursuant to the Health Information Portability and Accountability Act of 1996 ("HIPAA"). A true and correct copy of Mid-West's April 24, 2006 correspondence is attached hereto as Exhibit D ("Ex. D.")

29.    On April 26, 2006, Mid-West further contacted Plaintiffs again, requesting either execution of the Administrative Endorsements excluding coverage for any disease, disorder or injury of the thoracic spine, its muscles, ligaments, discs or nerve roots and any disease, disorder or injury of the lumbar spine, its nerve roots, ligaments or muscles or of an Agreement of Rescission and General Release, both enclosed with its correspondence. A true and correct copy of Mid-West's April 26, 2006 correspondence is attached hereto as Exhibit E ("Ex. E.")

30.    On June 21, 2006, when Mid-West did not hear back from Plaintiffs, it rescinded the coverage *ab initio* and forwarded check #2000579 in the amount of $552.00, check #2000578 in the amount of $840.00 and check #200577 in the amount of $5,708.62, representing a full refund of all premiums paid since coverage began less any claims previously paid. True and correct copies of Mid-West's June 21, 2006 correspondence and of the refund checks are attached hereto as Exhibit F ("Ex. F.")

31.    Mid-West is legally excused from performing its obligations under the insurance certificates, which were void *ab initio*, based on the material misrepresentations and/or omissions made by Plaintiffs in their Application for coverage.

9

WHEREFORE, Mid-West requests that this Court enter judgment in its favor and against Plaintiff, rescind the Policy and award to Mid-West such other and further relief as this Court deems just and equitable including, but not limited to, an award to Mid-West of its reasonable costs in defending this action.

### SECOND AFFIRMATIVE DEFENSE

#### (Certificate Of Insurance)

1.      In the alternative and without waiver of its position that the Coverage at issue is rescinded and void *ab initio*, Plaintiffs' rights and remedies are limited by the explicit terms of Basic Hospital/Medical-Surgical Expense Certificate No. 02404375799, Group Dental Insurance Certificate No. 02444375799 and Vision Insurance Certificate No. 02414375799. Said certificates are written documents and, as such, are the best evidence of their terms, conditions, coverage, exclusions, limitations, and all other matters pertaining thereto.

2.      Accordingly, Mid-West pleads the Certificates, referred to in the Complaint, as a complete defense to Plaintiff's claims as if copied *in extenso* herein.

WHEREFORE, Mid-West requests that this Court enter judgment in its favor and against Plaintiff, rescind the Policy and award to Mid-West such other and further relief as this Court deems just and equitable including, but not limited to, an award to Mid-West of its reasonable costs in defending this action.

### THIRD AFFIRMATIVE DEFENSE
#### (Pre-existing Condition)

1.      In the alternative and without waiver of its position that the Coverage at issue is rescinded and void *ab initio*, Basic Hospital/Medical-Surgical Expense Certificate No. 02404375799 excludes coverage for pre-existing conditions, defined as follows:

413547.1

Pre-Existing Condition means a medical condition, Sickness or injury not excluded by name or specific description for which:

1.    Medical Advice, Consultation or Treatment was recommended by or received from a Physician within the two year period before the Effective Date of Coverage; or

2.    Symptoms existed which would cause an ordinarily prudent person to seek diagnosis, care or treatment within the two year period before the Effective Date of Coverage.

Ex. B at p. 8.

2.    Plaintiff received treatment for sicca syndrome in January 2005, for diverticulosis, bile reflux and lumbar and thoracic disc bulging in February 2005, for Irritable Bowel Syndrome in March 2005 and for cervical radiculopathy in April 2005. Any and all of these conditions are pre-existing and excluded from coverage pursuant to the coverage issued.

WHEREFORE, Mid-West requests that this Court enter judgment in its favor and against Plaintiff, rescind the Policy and award to Mid-West such other and further relief as this Court deems just and equitable including, but not limited to, an award to Mid-West of its reasonable costs in defending this action.

## DEFENDANT MID-WEST NATIONAL LIFE INSURANCE COMPANY OF TENNESSEE'S COUNTERCLAIM FOR EQUITABLE RESCISSION

For its counterclaim against Plaintiffs Fred Plambeck and Susan Plambeck ("Plaintiffs"), The Mid-West National Life Insurance Company of Tennessee ("Mid-West"), pleading without prejudice to or waiver of its answers and affirmative defenses plead, states as follows:

### Parties and Jurisdiction

1.    Defendant-Counterplaintiff Mid-West is an insurance company organized under the laws of the State of Texas with its principal place of business located at 9151 Boulevard 26, North Richland Hills, Texas.

413547.1

2.    Upon information and belief, Plaintiffs-Counterdefendants are citizens of the State of Illinois.

3.    The matter in controversy exceed, exclusive of interest and costs, the sum of $75,000.

4.    At all relevant times, Mid-West underwrote health insurance benefits provided to members of the Alliance for Affordable Services pursuant to the terms of group insurance policy No. 00401, incident to their membership.

**The Application**

5.    On or about June 15, 2005, Plaintiffs applied for health, dental and vision coverage by providing answers to specific questions and finally signing an application for coverage.  ("Application")  A true and correct copy of the Application is attached to this pleading as Exhibit A ("Ex. A.")

6.    In completing the Application, Plaintiffs answered "No" to the following question:

> 17.    Have you or any Applicant EVER had symptoms, been diagnosed, received medical advice or been treated for (if "Yes," circle applicable condition):
>
> (1) back, spine, arm or leg disorder or arthritis, gout, bursitis or neuritis?

7.    Plaintiffs answered "Yes" to the following question:

> 18.    Any other medical or surgical advice, hospitalizations, treatment, operations, or testing in the last five (5) years?

8.    In response to Question 19, which requests 'Give complete details of all "Yes" answers to Questions 17 through 18' Plaintiffs disclosed the following information:

12

| Name | Nature of Illness or Accident (Include Diagnosis, Operations, and Medications) | Date Started | Date Stopped | Operation | Hospitalized | Doctor's Name and Address |
|---|---|---|---|---|---|---|
| Dr. Rush Susan Plambech | had hysterectomy | 3-10-05 | 3-10-05 | ☒Yes ☐No | ☒Yes ☐No | Dr. Prus 847-382-3520 (illegible) Barrington IL 60010 |
| | | | | ☐Yes ☐No | ☐Yes ☐No | |
| | | | | ☐Yes ☐No | ☐Yes ☐No | |
| | | | | ☐Yes ☐No | ☐Yes ☐No | |
| | | | | ☐Yes ☐No | ☐Yes ☐No | |
| If additional space is needed, use separate paper to record complete information with signature of Applicant. | | | | | | |

9.    Plaintiffs made no other disclosures regarding any health conditions, treatment, surgery or medications on the Application for Coverage.

10.    In reliance upon the information provided on the Application and in the belief that the information was true and complete, Mid-West approved Plaintiffs and their daughter for coverage and underwrote and issued Basic Hospital/Medical-Surgical Expense Certificate No. 02404375799, Group Dental Insurance Certificate No. 02444375799 and Vision Insurance Certificate No. 02414375799 (collectively "Certificates") on June 21, 2005. True and correct copies of the Certificates are attached to this pleading as Exhibit B (Ex. B").

11.    Within two years of the effective dates of the Certificates, Plaintiffs submitted a number of claims for insurance coverage for medical services received.

## COUNT I

## RESCISSION OF CERTIFICATES OF INSURANCE

12.    Mid-West incorporates paragraphs 1 through 11 above as if fully set forth herein as and or paragraphs 1 through 11 of Count I.

13.    During a routine pre-existing condition review within the two-year contestability period pursuant to the Certificates of Insurance, Mid-West requested medical records from Plaintiff's primary care and other treating physicians.

13

413547.1

14.    The medical records revealed that Plaintiff Susan Plambeck experienced abdominal pain in the lower right quadrant and went to the emergency room on January 25, 2005. The CT scan results showed a small cyst in the right lobe of her liver, previous cholecystectomy, cystic areas of lower uterine segment, compatible with nabothian cysts and thickening of the wall of the sigmoid colon without standing or abscess formation yet possibly indicative of mild diverticulosis.

15.    A follow up visit on January 27, 2005 indicated that Plaintiff Susan Plambeck suffered from Sicca syndrome.

16.    On February 3, 2005, a CT scan of Plaintiff Susan Plambeck's abdomen and pelvis revealed diverticulosis. A colonoscopy performed on February 5, 2005 ruled out inflammatory bowel disease. On February 9, 2005, Plaintiff Susan Plambeck underwent an upper endoscopy due to bile reflux.

17.    On February 4, 2005, Plaintiff Susan Plambeck underwent MRI's of her thoracic and lumbar spine due to right flank pain. The thoracic MRI revealed evidence of mild anterior spurring and disc bulging in her mid to lower thoracic region consistent with mild degenerative arthritic change. The lumbar MRI indicated disc bulging at L2-3, L4-5, L5-S1 and minimal spurring of postero-inferior corners of L4 and L5.

18.    Plaintiff Susan Plambeck further underwent an MRI of her neck due to left parotid swelling and inflammation or infection in the left parotid gland.

19.    On April 5, 2005, Plaintiff Susan Plambeck presented for neck pain and headaches and underwent a cervical spine x-ray, which was normal.

20.    On April 15, 2005, Plaintiff Susan Plambeck again presented for neck pain and on May 27, 2005 for headaches.

21.     Plaintiffs' treating physician, Dr. Daniel R. Di Iorio, confirmed that the February 4, 2005 MRI findings had been discussed with Plaintiff Susan Plamback, who attempted conservative treatment including physical therapy and chiropractic care.

22.     Plaintiffs did not disclose any of Plaintiff Susan Plambeck's procedures, follow-ups, treatment and medical conditions described in paragraphs 10 through 16 on the Application for Coverage they completed and executed on June 15, 2005.

23.     Plaintiffs knowingly made material misrepresentations and/or knowingly withheld material information concerning Plaintiff Susan Plambeck's medical history on their Application for health insurance coverage with the actual intent to deceive Mid-West and for the purpose of inducing Mid-West to act favorably on their Application.

24.     In underwriting and issuing health insurance coverage to Plaintiffs, Mid-West relied on the belief that Plaintiffs had truthfully completed the Application and had disclosed their complete medical history on their Application.

25.     The Application completed and signed by Plaintiffs provides, in relevant part:

I agree that (a) all statements and answers in this Application are true to the best of my knowledge and belief; (b) this Application will form a part of the contract; (c) the agent does not have the authority on behalf of the Company to accept the risks, or to make, alter or amend the coverage or to extend the time for making any payment due on such coverage and (d) no insurance will take effect unless and until the Application is approved by the Company and the policy/certificate is delivered to the Applicant while the conditions affecting the insurability are and have remained as described herein and the first premium has been paid in full.

*See* Ex. A at p. 2.

26.     The Policy contains the following provisions:

After 2 years from the Insured Person's Effective Date of Coverage, no misstatements, except fraudulent misstatements, made in the enrollment application will be used to void the coverage, or deny a claim *unless the loss was incurred during the first 2 years following such Insured Person's Effective Date of Coverage.*

15

*See* Ex. B at p. 19 (emphasis added)

27.    On February 6, 2006, Mid-West advised Plaintiffs of the material misrepresentations on the application for insurance, inducing it to issue coverage. A true and correct copy of Mid-West's February 6, 2006 correspondence is attached hereto as Exhibit C ("Ex. C.") In that letter, Mid-West further advised Plaintiffs that if it had been aware of Plaintiff Susan Plambeck's previous medical history, the Certificate would have only been issued with Administrative Endorsements for her thoracic and lumbar spine. Mid-West requested that Plaintiffs execute the Administrative Endorsements enclosed with the correspondence by February 27, 2006 or it would rescind coverage and refund the premium paid less any claims previously paid by Mid-West. *See* Ex. C.

28.    On February 21, 2006, Plaintiffs responded and requested a copy of the medical records Mid-West reviewed. Plaintiffs indicated that if the records indicated treatment for bulging disc, they would sign the Endorsement.

29.    On April 24, 2006, Mid-West requested that Plaintiffs sign a release authorizing it to do so pursuant to the Health Information Portability and Accountability Act of 1996 ("HIPAA"). A true and correct copy of Mid-West's April 24, 2006 correspondence is attached hereto as Exhibit D ("Ex. D.")

30.    On April 26, 2006, Mid-West further contacted Plaintiffs again, requesting either execution of the Administrative Endorsements excluding coverage for any disease, disorder or injury of the thoracic spine, its muscles, ligaments, discs or nerve roots and any disease, disorder or injury of the lumbar spine, its nerve roots, ligaments or muscles or of an Agreement of Rescission and General Release, both enclosed with its correspondence. A true and correct copy of Mid-West's April 26, 2006 correspondence is attached hereto as Exhibit E ("Ex. E.")

16

413547.1

31.    On June 21, 2006, when Mid-West did not hear back from Plaintiffs, it rescinded the coverage *ab initio* and forwarded check #2000579 in the amount of $552.00, check #2000578 in the amount of $840.00 and check #200577 in the amount of $5,708.62, representing a full refund of all premiums paid since coverage began less any claims previously paid. True and correct copies of Mid-West's June 21, 2006 correspondence and of the refund checks are attached hereto as Exhibit F ("Ex. F.")

32.    Plaintiffs' coverage under Basic Hospital/Medical-Surgical Expense Certificate No. 02404375799, Group Dental Insurance Certificate No. 02444375799 and Vision Insurance Certificate No. 02414375799 is void *ab initio* based on the material misrepresentations and/or omissions made by Plaintiffs in their Application for insurance.

33.    The information provided on the Application submitted by Plaintiffs was fraudulent and materially false.

34.    Plaintiffs knowingly failed to disclose material information and made material misrepresentations concerning Plaintiff Susan Plambeck's health and medical history on the Application for coverage for the purpose of inducing Mid-West to act favorably on their Application.

35.    Mid-West reasonably relied to its detriment upon the misrepresentations made on the Application in connection with the issuance of health insurance coverage to Plaintiffs.

36.    Plaintiffs' non-disclosure and misrepresentation of Plaintiff Susan Plambeck's medical history materially affected the risk or the hazard assumed by Mid-West in underwriting and issuing health insurance coverage to Plaintiffs.

37.    Had Mid-West known the true facts concerning Plaintiff Susan Plambeck's complete medical history at the time Plaintiffs applied for coverage, it would only have approved

17

the coverage with execution of waiver No. H1740 covering any treatment relative to Plaintiff Susan Plambeck's thoracic spine and waiver No. H1746 covering any treatment relative to Plaintiff Susan Plambeck's lumbar spine. Mid-West would not have issued the coverage that was issued.

38.     Had Mid-West known that MRI's of Plaintiff Susan Plambeck's thoracic and lumbar spine indicated disc bulging in mid to lower thoracic area and disc bulging at L2-3, L4-5, L5-S1 and spurring of postero-inferior corners of the L4 and L5 vertebra, it would not have approved Plaintiffs for coverage without execution of waivers Nos. H1740 and 1746 and would not have issued the coverage that was issued.

39.     Mid-West has reimbursed Plaintiffs for the premium payments made on Basic Hospital/Medical-Surgical Expense Certificate No. 02404375799, Group Dental Insurance Certificate No. 02444375799 and Vision Insurance Certificate No. 02414375799, issued to them, less any claims previously paid.

WHEREFORE, Mid-West requests that this Court enter a judgment rescinding Basic Hospital/Medical-Surgical Expense Certificate No. 02404375799, Group Dental Insurance Certificate No. 02444375799 and Vision Insurance Certificate No. 02414375799 issued to Plaintiffs and releasing Mid-West from liability on claims brought under the Certificates.

Respectfully submitted,

**THE MID-WEST NATIONAL LIFE
INSURANCE COMPANY OF TENNESSEE,
Defendant**

By: _Edua Ba ey_
One of Its Attorneys

Daniel J. McMahon, Esq.

18

Edna S. Bailey, Esq.
Wilson, Elser, Moskowitz,
Edelman & Dicker, LLP
120 N. LaSalle Street, Suite 2600
Chicago, IL 60602
312-704-0550

413547.1

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that a true and correct copy of the above and foregoing pleading was served on

***Attorney for Plaintiff***
Douglas K. Morrison
MORRISON & MIX
120 N. LaSalle Street
Suite 2750
Chicago, Illinois 60603
(312) 726-0888

by depositing same in the U.S. Mail, postage prepaid, before the hour of 5:00 p.m. this 23rd day of August, 2007.

*Edna Bailey*

Edna S. Bailey

413547.1

MW/2004 APP 06/04 (06/04)

☒ Cover America Plus (#25906)
Ded: ☐ $1,000 ☐ $2,000 ☒ $3,000 ☐ $5,000  Misc. Hosp: ☒ 30x ☐ 60x
R&B: ☐ $300 ☐ $400 ☐ $500 ☐ $600 ☒ $800 ☐ $1,000 ☐ $1,200 ☐ $1,400
Surgery Benefit: ☒ 10x Outpatient Surgery Facility: ☒ 7x ☐ 10x
☐ Personal Choice (#25907)
In Netwk. Ded: ☐ $1,500 ☐ $2,500 ☐ $5,000 ☐ $7,500 ☐ $10,000
Aggregate Maximum: ☐ $500,000 ☐ $1,000,000
☐ Cover America Together (#25939)
Ded: ☐ $5,000 ☐ $10,000 ☐ $15,000 ☐ $20,000
Coinsurance Amount: ☐ 100% ☐ 80% ☐ 50%
☒ Accident Benefit Care (#25924) Cannot be sold with health
Ded: ☐ $500 ☐ $1,000 ☐ $1,500 ☐ $2,000
R&B: ☐ $300 ☐ $400 ☐ $500 ☐ $600 ☐ $700
Surgery Benefit: ☐ 2x ☐ 3x  Outpatient Surgery Facility: ☐ 9x ☐ 12x

Payment Mode: ☒ LM ☐ Q ☐ SA ☐ A
82.25
Agency Lead #_____ ☐ Ref. ☐ PDL

If any family member is declined, do you still want coverage?
☐ Yes or ☐ No

Special Request(s):

### Additional/Optional Benefits

☐ Continued Care Benefit (#25883)
☒ Injury Deductible Benefit (#25911)
☒ Ambulatory Care (#25885 9/03)
  ☐ Plan A $50 Copay ☒ Plan B $250 Copay ☐ Plan C $500 Copay
☐ Outpatient Accident (#25882) Ded $_____ Max $_____
☐ Pregnancy/Childbirth Benefit (#25884)
  ☐ $1,000 ☐ $2,000 ☐ $3,000 ☐ $4,000 ☐ $5,000 ☐ $6,000
☐ Accumulated Covered Expense (#25890)
☒ Urgent Care (#25947) Copay $ 250   Max $ 1000
☒ Physician's Office Visit (#25886) ☒ 1 visit ☐ 2 visits
☐ Family Wellness (#25888 9/03) Coinsurance ____% Max $_____
☐ Return of Premium (#25044)

☒ Outpatient Chemo/Radiation Therapy (#25910)
☒ Legend RX Drug (#25892) Ded. $ 100  Max. $ 100 n
☒ Dental Plan (#25879) ☒ Vision (#25213)
☐ Cancer Wise (#25616) $10,000
☐ Primary Insured ☐ Spouse ☐ Children
☐ Safety Net Life Plan (#25430) ☐ Optional ALBR (#25894)
  Primary Insured – Face Amount $_____
  Beneficiary's Name:
  Spouse – Face Amount $_____
  Beneficiary's Name:
  Dependent – Face Amount $_____
  Beneficiary's Name:
☐ Other

**Enrollment Application for: Mid-West National Life Insurance Company of Tennessee • Oklahoma City, Oklahoma 73118**

## 1. SCHEDULE OF FAMILY MEMBERS – FIGURE HEALTH PREMIUM AT AGE LAST BIRTHDAY

| PLEASE PRINT (Full Name) | Sex | Relationship | Social Security # | Birthdate | Birthplace | Age | Height | Weight |
|---|---|---|---|---|---|---|---|---|
| (1) Fred Plambeck | M | Primary | 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 | 6-4-1949 | IL | 56 | 6' | 182 |
| (2) Susan Plambeck | F | Spouse | 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 | 11-10-1958 | IL | 48 | 5'7 | 155 |
| (3) Megan Chartier | F | Child | 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 | 8-14-1989 | IL | 15 | 5'5" | 160 |
| (4) | | | | | | | | |
| (5) | | | | | | | | |

2. Marital Status: ☐ Single ☒ Married
3. Applicant's Home Address
   Address  28869 Pioneer Grove
   City Long   State IL   Zip 60013
   County McHenry
   Daytime Telephone ( 847 ) 516-7267
   Home Telephone ( 847 ) 516-7267
   Email Address  none
   Fax Number ( ) none
4. Are all members U.S. Citizens? yes
   If "No," please explain:
   How long in the U.S.?
5. Occupation and duties of adult family members:
   (1) Computer
   (2) stud mother
6. Are all members between the ages of 19 and 24 full-time
   students? no
   If "Yes," name school
   Hours currently enrolled
   If "No," which Applicant?
   Explain
7. Is the Applicant, spouse or any dependent child (even if not
   proposed for insurance) now pregnant or an expectant father?
   If "Yes," whom? no
   Estimated date of delivery  none
8. Is any Applicant eligible for or covered under Medicare or
   Medicaid? If "Yes," whom? no
9. Do you currently have health insurance? no
   If "Yes," is it ____ Group or ____ Individual, names of companies,
   certificate/policy number, and types of coverage?

Date of cancellation
Will existing health coverage be replaced or changed if proposed
health coverage is issued? ____ Yes ____ No
If "No," reason
10. Does any Applicant to be insured engage in any hazardous sport
    or activity? (e.g.: flying, diving, skydiving, racing.)
    Name: no   Activity: none
11. During the past ten years, has any person to be insured had
    insurance declined, rated, ridered, or otherwise changed?
    If "Yes," which Applicant? no   Date / /
    Reason: none
    Company:
12. a) Applicant's Doctor Dr. DiTerio
    Address 500 W HWY 22
    City Barrington   State IL   Zip 60078
    Telephone Number ( 847 ) 381-3000
    b) Spouse's Doctor Dr. DiTerio
    Address 500 W HWY 22
    City Barrington   State IL   Zip 60078
    Telephone Number ( 847 ) 381-3000
    c) Child(ren)'s Doctor Dr. DiTerio
    Address 500 W HWY 22
    City Barrington   State IL   Zip 60078
    Telephone Number ( 847 ) 381-3000
13. Is any Applicant presently taking any medications?
    Who? none
    What?
    Why?
14. Has any Applicant used tobacco products in the last 12
    months? yes  If "Yes," who and what? primary & spouse
    cigarettes

MW-25098-APP (8/00)                **EXHIBIT A**                (06/04)

15. Have you or any Applicant ever had your driver's license suspended, revoked or ever received any citations for driving while under the influence (i.e. DWI or DUI)? _no_ If "Yes," list details. _____

16. a) When was the last time the Applicant visited a doctor? _10-05_
    Symptoms? _Checkup_ Results? _ok_ Recommendations? _none_
    b) When was the last time the spouse visited a doctor? _5-05_
    Symptoms? _checkup_ Results? _Ok_ Recommendations? _none_
    c) When was the last time the child(ren) visited a doctor? _3-05_
    Symptoms? _Checkup_ Results? _ok_ Recommendations? _none_

17. Have you or any Applicant EVER had symptoms, been diagnosed, received medical advice or been treated for (if "Yes," circle applicable condition):

| | YES | NO | | | YES | NO |
|---|---|---|---|---|---|---|
| a) Heart disorder, including murmur, heart attack, chest pain, artery or vein disorder, high blood pressure or stroke? | ☐ | ☒ | i) Hernia, hemorrhoids, polyps or rectal disorder? | ☐ | ☒ | |
| b) Diabetes, hypoglycemia, goiter or thyroid disorder? | ☐ | ☒ | j) Eye, ear, nose or throat disorders? | ☐ | ☒ | |
| c) Blood or spleen disorder including anemia or leukemia? | ☐ | ☒ | k) Skin disorders, burns, lacerations, dermatitis, boils or chronic rashes? | ☐ | ☒ | |
| d) Breast or reproductive organ disorder? | ☐ | ☒ | l) Back, spine, arm or leg disorder or arthritis, gout, bursitis or neuritis? | ☐ | ☒ | |
| e) Cancer, cyst, tumor or neoplasm? | ☐ | ☒ | m) Complications of pregnancy and/or Caesarean section? | ☐ | ☒ | |
| f) Respiratory disorder, including asthma, bronchitis, COPD, emphysema, lung disease or breathing problems? | ☐ | ☒ | n) Brain disorder, epilepsy, fainting spells, dizziness, seizures, paralysis, tremors, palsy, head injury or chronic headaches? | ☐ | ☒ | |
| g) Kidney, urinary bladder, urinary tract, stones or prostate disorders? | ☐ | ☒ | o) Mental or nervous disorder, depression, anxiety, alcoholism or drug addiction? | ☐ | ☒ | |
| h) Stomach, intestines, gallbladder, liver or pancreas disorder including ulcer, colitis, enteritis, hepatitis or pancreatitis? | ☐ | ☒ | p) Been diagnosed by a physician for any disorder of the blood or immune system including AIDS? | ☐ | ☒ | |

18. Any other medical or surgical advice, hospitalizations, treatment, operations, or testing in the last five (5) years? ☒

19. IMPORTANT: Give complete details of any "Yes" answers to questions 17 through 18.

| Name | Nature of Illness or Accident (Include Diagnosis, Operations, and Medications) | Date Started | Date Stopped | Operation | Hospitalized | Doctor's Name and Address |
|---|---|---|---|---|---|---|
| Susan Plambeck Dr. Rimes | had hysterectomy | 3-10-05 | 3-14-05 | ☒Yes ☐No | ☒Yes ☐No | Dr Rimes 847-382-2320 27401 W Hwy 22 Barrington IL 60010 |
| | | | | ☐Yes ☐No | ☐Yes ☐No | |
| | | | | ☐Yes ☐No | ☐Yes ☐No | |
| | | | | ☐Yes ☐No | ☐Yes ☐No | |
| | | | | ☐Yes ☐No | ☐Yes ☐No | |
| If additional space is needed, use separate paper to record complete information with signature of Applicant. | | | | | | |

### DECLARATIONS AND AGREEMENTS

I agree that (a) all statements and answers in this Application are true to the best of my knowledge and belief; (b) this Application will form a part of the contract; (c) the agent does not have the authority on behalf of the Company to accept the risks, or to make, alter or amend the coverage or to extend the time for making any payment due on such coverage and (d) no insurance will take effect unless and until the Application is approved by the Company and the policy/certificate is delivered to the Applicant while the conditions affecting the insurability are and have remained as described herein and the first premium has been paid in full.

### INSURANCE FRAUD WARNING

Any person who, with intent to defraud or knowing that he/she is facilitating a fraud against an insurer, submits an Application or files a claim containing a false or deceptive statement, or conceals information for the purpose of misleading is guilty of insurance fraud and is subject to criminal and/or civil penalties.

I have received and understand the Notification of Consumer Report and Medical Information Bureau Pre-Notice.

Dated at: City _Cary_ State _IL_ Month _June_ Day _15_ Year _2005_

Signed X _____ Signed X _____
Applicant (for and in behalf of above named person)    Applicant, Spouse, Parent (if minor), next of kin or legal representative

To Be Answered By Agent:
I certify that each question on this application was asked by me of the Applicant(s) named above, and all answers are accurately recorded.

X _____    Roberto Elliott    1/3908
Signature of Licensed Agent    Print Full Name    Agent Number

MW-25098-APP (8/00)

(06/04)

**MID-WEST NATIONAL LIFE INSURANCE COMPANY OF TENNESSEE**
**HYSTERECTOMY QUESTIONS**

Date: 6/15/05
File number:
Questions on: SUSAN PLUMBUK

1. **Why was the hysterectomy performed?**


2. **Was it a**
   ☒ Full hysterectomy
   ☐ Partial hysterectomy

3. **Date the hysterectomy performed:**
   3-10-05

4. **Any endometriosis?**
   ☒ No
   ☐ Yes, details:

5. **Any history of cancer?**
   ☒ No
   ☐ Yes, details:

6. **Any maintenance prescriptions?**
   ☒ No
   ☐ Yes
   If yes, elaborate:

| Name of medication | Dosage | Frequency | Details (if needed) |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

7. **Name, address and phone number of attending physician:**
   Name: Dr. Pires
   Street: 27401 W HWY22
   City: Borrington IL 60010
   Tel: 847-382-2320

8. **Additional Information (if needed)**


9. **Are you currently being treated for any other medical conditions of taking any other medications?**
   no

---

Signed at: Cory IL

Date: 6-15-05

Agent-Witness: [signature]

X Susan Plambeck
(Signature of proposed insured)

X
(Signature of spouse)

## IMPORTANT NOTICE CONCERNING YOUR HEALTH INSURANCE COVERAGE
## WOMEN'S HEALTH AND CANCER RIGHTS ACT OF 1998

The Women's Health and Cancer Rights Act was signed into Federal law on October 21, 1998. This law applies to health insurance plans that provide medical and surgical benefits with respect to a mastectomy. In the case of an insured who elects breast reconstruction in connection with a mastectomy, coverage will be provided in a manner determined in consultation with the attending physician and patient for:

* Reconstruction of the breast on which the mastectomy has been performed;
* Surgery and reconstruction of the other breast to produce a symmetrical appearance; and
* Prostheses and physical complications from all stages of the mastectomy, including lymphedemas.

The usual deductibles, co-insurance and other benefit limits of your health insurance plan will be applicable to the benefits provided under this Act.

This Act applies to the health insurance plan being issued to you. Please note, some states have enacted legislation that requires coverage for similar benefits. This notice describes the minimum level of benefits you will receive under Federal law. The benefits provided in your state may vary if the state law requirements exceed the Federal law requirements.

WHCRA-NOT-CERT (10/01)                                          XMXXX04002

## EXHIBIT B

## OFFICIAL NOTICE TO ALL CERTIFICATE HOLDERS

While our Company always strives to render the finest quality of service to our Insureds, it may be that at some point in the life of our association, we may not perform in accordance with the manner of standards you would like to be applied to any given situation. In that event, you may contact our Company by writing the following:

Insurance Center
P.O. Box 982010
North Richland Hills, Texas 76182-8010

If, after having corresponded with this Department, you are not satisfied with the result, you may write to the Public Service Division of the Department of Insurance at the following address:

Director of Insurance
Illinois Department of Insurance
Public Service Division
215 East Monroe Street
Springfield, Illinois 62767

## ILLINOIS
## LIFE AND HEALTH INSURANCE GUARANTY
## ASSOCIATION LAW

Residents of Illinois who purchase health insurance, life insurance, and annuities should know that the insurance companies licensed in Illinois to write these types of insurance are members of the Illinois Life and Health Insurance Guaranty Association. The purpose of this Guaranty Association is to assure that policyholders will be protected, within limits, in the unlikely event that a member insurer becomes financially unable to meet its obligations. If this should happen, the Guaranty Association will assess its other member insurance companies for the money to pay the covered claims of policyholders that live in Illinois (and their payees, beneficiaries, and assignees) and, in some cases, to keep coverage in force. The valuable extra protection provided by these insurers through the Guaranty Association is not unlimited, however, as noted below.



## SUMMARY OF GENERAL PURPOSES AND
## CURRENT LIMITATIONS OF COVERAGE

The Illinois law that provides for this safety-net coverage is called the Illinois Life and Health Insurance Guaranty Association Law ("Law")(215 ILCS 5/531.01, et seq.). The following contains a brief summary of the Law's coverages, exclusions and limits. This summary does not cover all provisions,  nor does it in any way change anyone's rights or obligations under the Law or the rights or obligations of the Guaranty Association. If you have obtained this document from an agent in connection with the purchase of a policy, you should be aware that its delivery to you does not guarantee that your policy is covered by the Guaranty Association.

a) Coverage:

The Illinois Life and Health Insurance Guaranty Association provided coverage to policyholders that reside in Illinois for insurance issued by members of the Guaranty Association, including:

1)   life insurance, health insurance, or annuity contracts;
2)   life, health or annuity certificates under direct group policies or contracts;
3)   unallocated annuity contracts; and
4)   contracts to furnish health care services and subscription certificates for medical or health care services issued by certain licensed entities. The beneficiaries, payees, or assignees of such persons are also protected, even if they live in another state.

b) Exclusions From Coverage:

1)   The Guaranty Association does not provide coverage for:

A) any policy or portion of a policy for which the individual has assumed the risk;
B) any policy of reinsurance (unless an assumption certificate was issued);
C) interest rate guarantees which exceed certain statutory limitations;
D) certain unallocated annuity contracts issued to an employee benefit plan protected under the Pension Benefit Guaranty Corporation and any portion of a contract which is not issued to or in connection with a specific employee, union or association of natural persons benefit plan or a government lottery;
E) any portion of a variable life insurance or variable annuity contract not guaranteed by an insurer, or
F) any stop loss insurance.

2)   In addition, persons are not protected by the Guaranty Association if:

A) the Illinois Director of Insurance determines that, in the case of an insurer which is not domiciled in Illinois, the insurer's home state provides substantially similar protection to Illinois residents which will be provided in a timely manner; or
B) their policy was issued by an organization which is not a member insurer of the Association.

c) Limits On Amount Of Coverage:

1)   The Law also limits the amount the Illinois Life and Health Insurance Guaranty Association is obligated to pay. The Guaranty Associations's liability is limited to the lesser of either:

A) the contractual obligations for which the insurer is liable or for which the insurer would have been liable if it were not an impaired or insolvent insurer, or
B) with respect to any one life, regardless of the number of policies, contracts or certificates:

i.   in the case of life insurance, $300,000 in death benefits but not more than $100,000 in net cash surrender or withdrawal values;
ii.  in the case of health insurance, $300,000 in health insurance benefits, including net cash surrender or withdrawal values; and
iii. with respect to annuities, $100,000 in the present value of annuity benefits, including net cash surrender or withdrawal values, and $100,000 in the present value of annuity benefits for individuals participating in certain government retirement plans covered by an unallocated annuity contract. The limit for coverage of unallocated annuity contracts other that those issued to certain governmental retirement plans is $5,000,000 in benefits per contractholder, regardless of the number of contracts.

2)   However, in no event is the Guaranty Association liable for more than $300,000 with respect to any one individual.

# MID-WEST NATIONAL LIFE INSURANCE COMPANY OF TENNESSEE

A Stock Company
(Hereinafter called: the Company, We, Our or Us)
Home Office: Oklahoma City, Oklahoma
Administrative Office: P.O. Box 982010
North Richland Hills, Texas 76182-8010
Customer Service: 1-800-733-1110

## BASIC HOSPITAL/MEDICAL-SURGICAL EXPENSE CERTIFICATE

### IMPORTANT NOTICE ABOUT STATEMENTS IN THE ENROLLMENT APPLICATION

The attached enrollment application is a part of this Certificate. Please read it and check it carefully. This Certificate is issued on the basis that Your answers are correct and complete. If it is not complete or has an error, please let Us know within 10 days. An incorrect enrollment application may cause Your coverage to be voided, or a claim to be reduced or denied.

### 10 DAY RIGHT TO EXAMINE THE CERTIFICATE

It is important to Us that You understand and are satisfied with the coverage being provided to You. If You are not satisfied that this coverage will meet Your insurance needs, You may return this Certificate to Us at Our administrative office in North Richland Hills, Texas, within 10 days after You receive it. Upon receipt, We will cancel Your coverage as of the Certificate Date, refund all premiums paid and treat the Certificate as if it were never issued.

### RENEWABILITY

This Certificate is guaranteed renewable, subject to the Company's right to discontinue or terminate the coverage as provided in the TERMINATION OF COVERAGE section of this Certificate. The Company reserves the right to change the applicable table of premium rates on a Class Basis. The premium for the Certificate may change in amount by reason of an increase in the age of an Insured Person.

This Certificate is a legal contract between You and Us. **PLEASE READ YOUR CERTIFICATE CAREFULLY!**

SECRETARY                    PRESIDENT

### IMPORTANT MESSAGE TO OUR CERTIFICATEHOLDERS

Canceling health insurance coverage and purchasing new coverage, on account of encouragement by any agent, is called replacement. Some states have laws which forbid any misrepresentation by any agent that may occur at the time of replacement. Beware of anyone who encourages You to replace this coverage without allowing You time to carefully investigate the replacement proposal, or discourages You from talking with a representative of the Company whose coverage is being recommended for replacement. For Your protection, if You are encouraged to replace this coverage, We urge You to seek advice and to take the time to investigate any recommendation.

MW-25906-C                    -1-   DUPLICATE                    RMCXX17001

## CERTIFICATE SCHEDULE

COVERAGE IS PROVIDED UNDER GROUP POLICY NO.:   00401
ISSUED TO GROUP POLICYHOLDER:  The Alliance Group Insurance Trust

PRIMARY INSURED:  FRED PLAMBECK
COVERED DEPENDENTS:  SUSAN            MEGAN

CERTIFICATE NUMBER:   404375799                 CERTIFICATE DATE:  06/21/2005
INITIAL PREMIUM:        $654.23                 MODE OF PAYMENT:  MONTHLY

### SCHEDULE OF BENEFITS

LIFETIME MAXIMUM AMOUNT:                         $1,000,000

AGGREGATE MAXIMUM AMOUNT:                        $500,000

DEDUCTIBLE
Per Insured Person, for each Admission to
a Hospital or Outpatient Surgery Facility:       $3,000

| BENEFITS | COINSURANCE | MAXIMUM BENEFIT |
| --- | --- | --- |
| Hospital Room and Board Amount | 100% | up to $800 per day |
| Hospital Intensive Care/ Cardiac Care Unit (Limited to 90 days per Injury or Sickness) | 100% | up to $2,400 per day |
| Miscellaneous Hospital Inpatient Charges | 80% | up to $24,000 |
| Physician Visits While Hospital Confined (Limited to one visit per day) | 80% | up to $100 per day |
| Surgeon Benefit | 80% | up to $8,000 |
| Assistant Surgeon | 100% | up to 20% of the amount paid to Surgeon not to exceed $1,600 |
| Anesthesiologist | 100% | up to 30% of the amount paid to Surgeon not to exceed $2,400 |
| Outpatient Surgery Facility Charges | 80% | up to $5,600 |
| Second Surgical Opinion Office Visit Charge | 100% | up to $100 |

# TABLE OF CONTENTS

|                              | PAGE |
|------------------------------|------|
| CERTIFICATE SCHEDULE         | 3    |
| DEFINITIONS                  | 5    |
| EFFECTIVE DATE OF COVERAGE   | 9    |
| PREMIUMS                     | 10   |
| TERMINATION OF COVERAGE      | 10   |
| CASE MANAGEMENT              | 12   |
| BENEFITS                     | 13   |
| EXCLUSIONS AND LIMITATIONS   | 15   |
| COORDINATION OF BENEFITS     | 16   |
| GENERAL PROVISIONS           | 18   |

## CERTIFICATE SCHEDULE (Continued)

| BENEFITS | COINSURANCE | MAXIMUM BENEFIT |
|---|---|---|
| **Ambulance Transport** | 80% | up to $250* per trip |
| *Effective 8/29/05 or Your Certificate Date, whichever is later, | | |
| Ambulance Transport Maximum Benefit | | up to $500 per trip |
| **All other Benefits listed as Covered Expenses but not specifically listed in this Schedule of Benefits and not specifically excluded** | 80% | |

## CERTIFICATE SCHEDULE (Continued)

### SCHEDULE OF BENEFITS (Continued)

| RIDER BENEFITS | AMOUNT OF BENEFIT |
|---|---|
| **URGENT CARE BENEFIT RIDER** | |
| Copayment, per Insured Person, per visit | $250 |
| Copayment, per Insured Person for follow-up care to an Injury | |
| when received in a Physician's office | $25 |
| (follow-up benefits not to exceed 45 days from date of Injury) | |
| Coinsurance | 100% |
| Maximum per Insured Person, | |
| per Injury or Urgent Care Treatment of a Sickness | $1,000 |
| **LEGEND PRESCRIPTION DRUG EXPENSE RIDER** | Yes |
| | |
| **AMBULATORY CARE RIDER** | |
| Lifetime Maximum Amount, per Insured Person | $100,000 |
| Copayment per Insured Person, per visit for | |
| Physical, Occupational and/or Speech Therapy | $100 |
| Copayment per Insured Person, per visit for all other | |
| Covered Expenses | $250 |
| Coinsurance | 100% |
| Maximum Benefit Amount, per Insured Person, per 24 hours for | |
| Physical, Occupational and/or Speech Therapy | $500 |
| Maximum Benefit Amount, per Insured Person, | |
| per 24 hours for all other Covered Expenses | $1,000 |
| **PHYSICIAN OFFICE VISIT BENEFIT RIDER*** | |
| Copayment, per visit | $25 |
| Daily Maximum Benefit, per visit | $50 |
| Maximum Number of visits per calendar quarter | |
| for You and Your Covered Dependent Spouse | 1 visit(s) each |
| Maximum Number of visits per calendar quarter | |
| for Your Covered Dependent Child(ren) | 2 visits each |

*The Sickness Exclusion as shown in the EXCLUSIONS AND LIMITATIONS section does not apply to this Rider.

| | |
|---|---|
| **INJURY DEDUCTIBLE RIDER** | |
| Deductible | $1,500 |
| **OUTPATIENT CHEMOTHERAPY/RADIATION** | |
| **THERAPY FOR CANCER TREATMENT RIDER** | |
| Lifetime Maximum Amount, per Insured Person | $100,000 |
| Coinsurance | 100% |
| Daily Maximum Benefit | up to $1,000 |

DUPLICATE

## DEFINITIONS

**Aggregate Maximum Amount** means the maximum amount payable under this Certificate and its Riders, if any, for any one covered Injury or Sickness for each Insured Person, occurring while coverage is in effect under this Certificate for such person. The Aggregate Maximum Amount is shown in the CERTIFICATE SCHEDULE. This amount is included in and part of the Lifetime Maximum amount for each Insured Person.

**Ambulance** means a ground vehicle, which is licensed as required by law, as an Ambulance, and is equipped to transport Sick or Injured people.

**Attained Age** means the Insured Person's age on the most recent annual anniversary of the Certificate.

**Calendar Year** means a twelve month period, which begins at 12:01 a.m. on January 1 of any year and ends at 12:00 midnight on December 31 of that year.

**Certificate** means the written description of coverage provided to You under the Group Policy.

**Class Basis** means the classification by which each Insured Person's rates are determined. We will not and cannot change the rates on this Certificate unless rates are changed on all Certificates issued on the same Class Basis.

**Coinsurance** means the shared percentage of Covered Expenses after satisfying the Deductible. The Coinsurance percentage We pay is shown in the CERTIFICATE SCHEDULE.

**Complications of Pregnancy** means:

1.  Conditions requiring Hospital Confinement or treatment in an Outpatient Surgery Facility (when the pregnancy is not terminated) whose diagnoses are distinct from pregnancy, but are adversely affected by pregnancy, including but not limited to: non-elective cesarean section, acute nephritis, nephrosis, cardiac decompensation, missed abortion, and similar medical and surgical conditions of comparable severity; or
2.  Termination of ectopic pregnancy, and spontaneous termination of pregnancy occurring during a time that a viable birth is not possible.

Complications of Pregnancy do not include false labor, occasional spotting, Physician prescribed rest during the period of pregnancy, morning sickness, hyperemesis gravidarum, pre-eclampsia, and similar conditions associated with the management of a difficult pregnancy not constituting a nosologically distinct complication.

**Confined/Confinement** means an Insured Person's Medically Necessary admission to and subsequent continued stay in a Hospital or Skilled Nursing Facility as an overnight bed patient and a charge for room and board is made.

**Consultation** means evaluation, diagnosis, or medical advice given without the necessity of a personal examination or visit.

**Cosmetic Surgery** means the surgical procedures for the sole purpose of improvement of appearance, which does not effect a substantial improvement or restoration of bodily function, except:

1.  Reconstructive Surgery incidental to or following Surgery resulting from trauma, infection or other disease of the involved part; or
2.  Reconstructive Surgery due to a congenital disease or anomaly of a newborn child which has resulted in a functional defect.

The condition which necessitates the Surgery must occur while coverage is in force and coverage remains in force through the date of Surgery.

**Covered Dependent** means an Eligible Dependent whose coverage has become effective under this Certificate and has not terminated.

**Covered Expenses** means Usual and Customary Charges for the services, supplies, care or treatment covered under this Certificate which are incurred by an Insured Person as a result of Injury or Sickness and for which the Insured Person is legally obligated to pay and are not otherwise excluded or limited herein. They are incurred on the date that the service is performed or the supply is furnished. Only that portion of a Usual and Customary Charge or fee which is Medically Necessary is a Covered Expense. Covered Expenses must be incurred while this coverage is in force.

Covered Expenses under the Riders, if any, may or may not be considered Covered Expenses under this Certificate.

**Deductible** means the amount of Covered Expenses that an Insured Person must pay for **each Admission to a Hospital or Outpatient Surgery Facility** before benefits will be paid. Deductible does **not** include non-Covered Expenses. **The Deductible will be applied separately for each Admission to a Hospital or Outpatient Surgery Facility for each Insured Person.**

Once this Deductible has been met 3 times in a Calendar Year by any or all Insured Persons under Your Certificate, no further Deductibles must be met for the remainder of that Calendar year for any or all Insured Persons under Your Certificate.

If more than one Insured Person in Your family is injured in the same accident, only one Deductible must be satisfied for Covered Expenses associated with that accident.

**Dental Care** means services, supplies or other care for dental services and procedures involving tooth structures, extractions, gingival tissues, alveolar processes, dental x-rays (for other than an accidental Injury), procedures of dental origin, odontogenic cysts/tumors, or any orthodontic, periodontic, orthognathic treatment regardless of Medical Necessity. Dental care includes services and supplies for maxillary and/or mandibular augmentation/implant procedures to facilitate the use of full or partial dentures, prosthesis, fixed or removable.

**Effective Date of Coverage** means the date coverage becomes effective under this Certificate with respect to a particular Insured Person.

**Eligible Dependent** means Your lawful spouse and Your unmarried natural and adopted children and step-children who reside in your home for more than 6 months in a year, who are under 19 years of age (the Limiting Age). The Limiting Age is extended from the child's 19th birthday to the child's 24th birthday if the child is enrolled as a full-time student and attends classes regularly at an accredited college or university.

**Experimental or Investigational Medicine** means a drug, device or medical treatment or procedure:

1.  If the drug, or device cannot lawfully be marketed without approval of the United States Food and Drug Administration and approval for marketing has not been given at the time the drug or device is furnished;
2.  If reliable evidence shows that the drug, device or medical treatment or procedure is the subject of ongoing Phase I, II, or III clinical trials or under study to determine its maximum tolerated dose, its toxicity, its safety, its efficacy, or its efficacy as compared with the standard means of treatment or diagnosis; or
3.  If reliable evidence shows that the consensus of opinion among experts regarding the drug, device or medical treatment or procedure is that further studies or clinical trials are necessary to determine its maximum tolerated dose, its toxicity, its efficacy, or its efficacy as compared with the standard means of treatment or diagnosis.

Reliable evidence means only published reports and articles in authoritative medical and scientific literature; the written protocol or protocols by the treating facility or the protocols of another facility studying substantially the same drug, device, or medical treatment or procedures; or the written informed consent used by the treating facility or by another facility studying substantially the same drug, device, or medical treatment or procedure.

**Group Policyholder** means the entity to which the group insurance contract ("Group Policy") is issued.

**Hospital** means an institution operated pursuant to its license for the care and treatment of sick and injured persons for which a charge is made that the Insured Person is legally obligated to pay. The institution must:

1. Maintain on its premises organized facilities for medical, diagnostic and surgical care for sick and injured persons on an inpatient basis;
2. Maintain a staff of one or more duly licensed Physicians;
3. Provide 24 hour nursing care by or under the supervision of a registered graduate professional nurse (R.N.); and
4. Is accredited as a Hospital by the Joint Commission on Accreditation of Hospitals.

The term "Hospital" does not include:

1. A convalescent, nursing, rest or rehabilitative facility; a home for the aged; a facility for the care and treatment of drug addicts and alcoholics; or a special ward, floor or other accommodation for convalescent, nursing, rehabilitation, ambulatory or extended care purposes; or hotel units, residential annexes or nurse administered units in or associated with a hospital; or
2. Any military or veteran's hospital, soldier's home or any hospital contracted for or operated by the Federal Government or any agencies thereof for the treatment of members or former members of the Armed Forces, unless the Insured Person is legally required to pay for services in the absence of this insurance coverage.

**Immediate Family** means the spouse, parent, son, daughter, brother or sister of the Insured Person.

**Injury** means bodily harm caused by an accident resulting in unforeseen trauma requiring immediate medical attention and is not contributed to, directly or indirectly, by a Sickness. The Injury must occur after the Insured Person's coverage has become effective and while the coverage is in force.

**Insured Person** means You or a Covered Dependent under this Certificate.

**Intensive Care/Cardiac Care Unit** means that part of a Hospital which:

1. Is segregated from the rest of the Hospital facilities;
2. Is exclusively reserved for critically ill patients who require audio-visual observation and/or cardiac monitoring as prescribed by the attending Physician; and
3. Provides room and board, specialized registered graduate professional nurses (R.N.), and special life saving equipment and supplies.

**Lifetime Maximum Amount** means the maximum amount payable under this Certificate and its Riders, if any, for all Covered Expenses combined, for each Insured Person. Any and all benefit amounts paid by Us will accumulate toward the Lifetime Maximum Amount from the Certificate Date. The Lifetime Maximum Amount is shown in the CERTIFICATE SCHEDULE.

**Maximum Benefit** means the maximum amount payable under this Certificate for each Insured Person for each Admission to a Hospital or Outpatient Surgery Facility. The maximum benefit is shown in the CERTIFICATE SCHEDULE.

**Medical Emergency** means the sudden onset of a medical condition for which the Insured Person seeks immediate medical treatment at the nearest available facility. The condition must be one which manifests itself by acute symptoms which are sufficiently severe that without immediate medical attention could reasonably be expected to result in:

1. Placing the Insured Person's health in serious jeopardy;
2. Serious impairment of bodily functions; or
3. Serious dysfunction of any bodily organ or part.

**Medically Necessary or Medical Necessity** means that a service or supply is necessary and appropriate for the diagnosis or treatment of an Injury or Sickness based on generally accepted current medical practice. A service or supply will not be considered Medically Necessary if:

1. It is provided only as a convenience to the Insured Person or provider;
2. It is not appropriate treatment for the Insured Person's diagnosis or symptoms;

3.    It exceeds (in scope, duration or intensity) that level of care which is needed to provide safe, adequate and appropriate diagnosis or treatment; or

4.    It is Experimental or Investigational Medicine.

The fact that a Physician may prescribe, order, recommend or approve a service or supply does not, of itself, make the service or supply Medically Necessary.

**Medicare** means the Health Insurance for the Aged Act, Title XVIII of the Social Security Amendments of 1965, as amended.

**Mental or Nervous Disorder** means any condition or disease, regardless of its cause, listed in the most recent edition of the International Classification of Diseases as a Mental Disorder, including but not limited to neurosis, psychoneurosis, psychopathy, psychosis, bipolar Affective Disorder or Autism.

**Outpatient Surgery Facility** means a licensed or certified public or private medical facility:

1.    With an organized staff of Physicians;
2.    Which is permanently equipped and operated primarily for the purpose of performing surgical procedures; and
3.    Which does not provide accommodations for overnight stays; and
4.    Which provide continuous Physician services and registered professional nursing services whenever a patient is in the facility.

The term "Outpatient Surgery Facility" will include surgical suites, and facilities operated by a Hospital, which provide scheduled, non-emergency outpatient surgical care.

The term "Outpatient Surgery Facility" does not include:

1.    Hospital emergency room;
2.    Trauma center;
3.    Physician's office (except as shown above); or
4.    Clinic; or
5.    Any facility that an Insured Person is admitted to as an overnight bed-patient and charged for room and board.

**Physician** means a legally qualified licensed practitioner of the healing arts who provides care within the scope of his or her license. (A member of the Insured Person's Immediate Family will not be considered a Physician.)

**Pre-Existing Condition** means a medical condition, Sickness or Injury not excluded by name or specific description for which:

1.    Medical advice, Consultation, or treatment was recommended by or received from a Physician within the two year period before the Effective Date of Coverage; or
2.    Symptoms existed which would cause an ordinarily prudent person to seek diagnosis, care or treatment within the two year period before the Effective Date of Coverage.

**Sickness** means an illness or disease which first manifests itself after the Insured Person's coverage becomes effective and while the coverage is in force.

**Surgery** means:

1.    The performance of generally accepted operative and cutting procedures, including surgical diagnostic procedures, specialized instrumentations, endoscopic examinations, and other invasive procedures;
2.    The correction of fractures and dislocations; and
3.    Any of the procedures designated by Current Procedural Terminology codes as Surgery.

**Transplant Procedure** means Medically Necessary human organ and tissue transplants, which are not considered Experimental or Investigational Medicine.

**Total Disability or Totally Disabled** means:

1.    With respect to You, You are unable to engage in any employment or occupation for which You are qualified by reason of education, training or experience and are not in fact engaged in any employment or occupation for wage or profit; and
2.    With respect to any other person under the Group Policy, Confinement as a bed patient in a Hospital.

**Usual and Customary Charges** means charge which is the smallest of:

1.    The actual charge;
2.    The charge usually made for the Covered Expense by the provider who furnishes it;
3.    The prevailing charge made for a Covered Expense in a geographical area by those of similar professional standing.

**We, Us and Our** means Mid-West National Life Insurance Company of Tennessee.

**You, Your, Yours** means the primary insured named in the Certificate Schedule whose coverage has become effective and has not terminated.

## EFFECTIVE DATE OF COVERAGE

**Beginning of Coverage**

We require evidence of insurability before coverage is provided. Once We have approved Your enrollment application based upon the information You provided therein, the Effective Date of Coverage for You and those Eligible Dependents listed in the application and accepted by Us will be the Certificate Date shown in the CERTIFICATE SCHEDULE.

**Newborn Children**

Your newborn children will be provided coverage after the Certificate Date from the moment of birth for 31 days. Coverage for Your newborn child(ren) will not continue beyond 31 days unless You send written notice directing Us to add the newborn child(ren) to Your Certificate. This notice must be received by Us within 31 days of the newborn child's date of birth and must be accompanied by any required additional premium. A claim form or Hospital bill does not constitute written notice.

Coverage for Your newborn child(ren) will be for Sickness or Injury, including care or treatment of:

1.    Congenital defects;
2.    Birth abnormalities; or
3.    Premature birth.

It will not include any benefits for normal newborn child care.

**Additional Dependents**

You may add Eligible Dependents by providing evidence of insurability satisfactory to Us and upon payment of any additional premium, if required. The acceptance of a new Eligible Dependent and the Effective Date of Coverage for such Eligible Dependent will be shown by endorsement and the date of the endorsement.

# PREMIUMS

**Premium Due Date**

Premiums are payable to Us at Our administrative office in North Richland Hills, Texas. The premium is payable monthly, quarterly, semi-annually or annually, as indicated in the CERTIFICATE SCHEDULE. Payment of any premium will not maintain coverage in force beyond the next premium due date, except as provided by the Grace Period. Upon the payment of a claim under this Certificate, any premium then due and unpaid or covered by any note or written order may be deducted therefrom.

**Grace Period**

There is a grace period of 31 days for the payment of any premiums due, except the first. At the end of the 31 day grace period, We may cancel the Certificate without further notice. During the grace period, the contract will remain in force; however, the Company is not obligated to pay any claims incurred by Insured Persons during the grace period unless and until the premium due is received during the grace period.

**Premium Changes**

We reserve the right to change the table of premiums, on a Class Basis, becoming due under the Group Policy at any time and from time to time; provided, We have given the Group Policyholder written notice of at least 31 days prior to the effective date of the new rates. Such change will be on a Class Basis. The premium for the Certificate may change in amount by reason of an increase in the Attained Age of the Insured Person.

# TERMINATION OF COVERAGE

**You**

Your coverage will terminate and no benefits will be payable under this Certificate and the attached Riders, if any:

1. At the end of the period for which premium has been paid;
2. At the end of the period through which premium has been paid following Our receipt of Your written request of termination;
3. On the date of fraud or misrepresentation by You;
4. On the date We elect to discontinue this plan or type of coverage. We will give You at least 90 days notice before the date coverage will be discontinued. You will be offered an option to purchase any other coverage that We offer without regard to health status;
5. On the date We elect to discontinue all coverage in Your state. We will give You and the proper state authority at least 180 days notice before the date coverage will be discontinued; or
6. On the date an Insured Person is no longer a permanent resident of the United States.

**Covered Dependents**

Your Covered Dependent's coverage will terminate under this Certificate on:

1. The date Your coverage terminates;
2. The date such dependent ceases to be an Eligible Dependent;
3. The date We receive Your written request to terminate a dependent's coverage.

The attainment of the limiting age for an Eligible Dependent will not cause coverage to terminate while that person is and continues to be both:

1. Incapable of self-sustaining employment by reason of mental retardation or physical handicap; and
2. Chiefly dependent on you for support and maintenance. For the purpose of this provision "Chiefly Dependent" means the Eligible Dependent receives the majority of his or her financial support from You.

We will require that You provide proof that the dependent is in fact a disabled and dependent person at least 31 days prior to the date upon which the dependent would otherwise reach the Limiting Age, and thereafter We may require such proof not more frequently than annually. In the absence of such proof We may terminate the coverage of such person after the attainment of the Limiting Age.

**Family Security Benefit**

Beginning with the next premium due date following Our receipt of due proof of Your death, We will waive premiums for a period of 12 months for Your Covered Dependents. During this premium waiver period no increase in benefits or addition of Eligible Dependents, except newborns, will be considered. Provisions for termination of coverage for Covered Dependents will apply. Upon expiration of the waiver period, Your Covered Dependent spouse may continue coverage, as stated in the SPECIAL CONTINUATION PROVISION FOR DEPENDENTS by making required premium payments and by becoming a member of the association to which the Group Policy is issued.

**Special Continuation Provision For Dependents**

Your Covered Dependents may continue their same (or substantially similar) coverage under a new Certificate without evidence of insurability if their coverage under this Certificate would otherwise terminate because they cease to be an Eligible Dependent for any of the following reasons:

1.    Divorce, legal separation, Your death; or
2.    A dependent child reaches the Limiting Age.

To continue coverage, You or Your Covered Dependent must request continuation of coverage by application or written notification within 31 days of the date coverage would otherwise terminate, pay any required premium and become a member of the association to which the Group Policy is issued.

**Group Policy**

The Group Policyholder may terminate the Group Policy, provided written notice is given at least 31 days prior to the date of termination.

**Extension of Benefits**

If an Insured Person is Totally Disabled at the time the Group Policy terminates, benefits will be payable for Covered Expenses incurred due to the Injury which caused such Total Disability. Such benefits are subject to the same terms and conditions of the Group Policy if the Group Policy had remained in force. This extension of benefits will cease on the earliest of:

1.    The date on which the Total Disability ceases; or
2.    The end of the 90 day period immediately following the date on which the Insured Person's insurance terminated.

**Reinstatement**

If coverage under this Certificate terminates due to non-payment of premium, We require an application for reinstatement. The reinstatement will not become effective unless We approved such application. We will advise You of the effective date of reinstatement by giving You written notice of the date, by issuing You an amended Certificate or by issuing You a new Certificate. In any case, the reinstated coverage provides benefits only for:

1.    Injury occurring after the effective date of reinstatement; and
2.    Sickness first manifesting itself more than 10 days after the effective date of reinstatement.

# CASE MANAGEMENT

## Pre-notification Requests of Medical Non-Emergency Admissions

The Insured Person, Physician or Hospital should call the toll-free telephone number shown on Your I.D. card at least five working days prior to the planned admission.

For emergency admissions, the patient, patient's representative, Physician or Hospital should call the toll-free telephone number shown on Your I.D. card within 2 working days of the admission to provide notification of any admission due to a Medical Emergency.

**IMPORTANT:** Pre-notification is not a guarantee that benefits will be paid.

## Case Management

Case Management authorized by Us or Our designated representative can provide reimbursement for alternative methods of care, even if the Insured Person is not covered for the alternate care or setting. Case Management is a method where We or Our designated representative will review an Insured Person's health problem and develop a plan of care that provides the most cost effective care for the Insured Person's specialized needs. The intent of Case Management is to ensure appropriate, cost effective care by extending extra-contractual benefits for alternative methods of care to Insured Persons who require the acute level of care setting. It is not designed to extend extra-contractual benefits for alternative methods of care to Insured Persons who do not meet Our standards or for services not authorized by Us or Our designated representative.

Benefits will be provided for the approved alternative methods of care only when and for so long as is determined that the alternative services are Medically Necessary and cost effective. These benefits will count toward the Insured Person's Lifetime Maximum Amount.

Our decision to implement Case Management will be made following Consultation with the affected Insured Person, or his or her legal representative, and the Insured Person's Physician.

If alternative benefits are provided for an Insured Person in one instance, it will not obligate Us to provide the same or similar benefits for any person in any other instance; nor will it be construed as a waiver of Our right to administer the Group Policy in strict accordance with its express terms.

## Second Physician's Opinion

We or Our designated representative may require an Insured Person to obtain a second opinion with respect to the procedures in question from a Physician selected by Us. The Insured Person must cooperate in obtaining a second opinion including any examination, testing, x-ray, or diagnostic procedures as are reasonable. There is no Coinsurance for the Physician's evaluation for the second opinion, nor for any tests needed to form the second opinion.

## Pre-Admission Testing

We or Our designated representative may require that certain testing be done before admission to a Hospital.

## BENEFITS

Benefits are payable under this Certificate for the following Covered Expenses. Unless otherwise stated herein, all Covered Expenses are subject to:

1. The Lifetime Maximum Amounts shown in the CERTIFICATE SCHEDULE;
2. The Deductible shown in the CERTIFICATE SCHEDULE;
3. The Coinsurance shown in the CERTIFICATE SCHEDULE;
4. The Maximum Benefit shown in the CERTIFICATE SCHEDULE;
5. The EXCLUSIONS AND LIMITATIONS; and
6. All other provisions of the Group Policy.

### COVERED EXPENSES

Covered Expenses mean the Medically Necessary Usual and Customary Charges for the services, supplies, care or treatment covered under this Certificate which are incurred by an Insured Person as a result of Injury or Sickness and for which the Insured Person is legally obligated to pay. They are incurred on the date that the service is performed or the supply is furnished. Only that portion of a Usual and Customary Charge which is Medically Necessary is a Covered Expense. Covered Expenses must be incurred while this coverage is in force.

**Hospital Room and Board**

Covered Expenses include semi-private accommodations and general nursing care furnished by the Hospital. The charges for a private room which exceed the charges for a semi-private room are not covered unless a private room is Medically Necessary.

**Hospital Intensive Care/Cardiac Care Unit**

Covered Expenses include Confinement in the Hospital's intensive care or cardiac care unit. This benefit is payable in lieu of benefit amount payable for Hospital Room and Board.

**Miscellaneous Hospital Inpatient Charges**

Covered Expenses include all charges made by a Hospital for miscellaneous medical services and supplies necessary for the treatment of the Insured Person during that Confinement.

Covered Expenses will also include x-ray, laboratory and other diagnostic tests, services of a radiologist or radiology group and for services of a pathologist or pathology group for interpretation of diagnostic tests or studies.

The fees charged for take home drugs, personal convenience items, or items not intended primarily for use of the Insured Person while Hospital Confined are not Covered Expenses.

**Physician Visits while Hospital Confined**

Covered Expenses include visits by a Physician, other than the surgeon, while Hospital Confined, limited to a single Physician visit per day.

This benefit is not subject to a Deductible.

**Surgeon Benefit**

Covered Expenses include the Physician's charges for performing Surgery.

If two or more surgeries are performed at the same time through separate incisions, We will pay the one providing the largest benefit. We will also pay 50% of the benefits otherwise payable for the other surgeries performed at the same time.

We will not pay for more than one Surgery performed through the same incision during the same operation; however, We will pay for the Surgery providing the largest benefit.

**Assistant Surgeon Benefit**

Covered Expenses include the Physician's charges for assisting the Physician performing Surgery.

**Anesthesiologist Benefit**

Covered Expenses include the Physician's charges for providing anesthesia during Surgery.

**Outpatient Surgery Facility Charges**

Covered Expenses include services furnished by and supplies received for use in an Outpatient Surgery Facility, including but not limited to:

1.  Use of operating room and recovery room;
2.  Administration of drugs and medicines during surgery;
3.  Dressings, casts, splints;
4.  Diagnostic services including radiology, laboratory or pathology performed at the time of the surgery.

**Second Surgical Opinion Office Visit Charge**

Covered Expenses include office visit charges made by a Physician for a Second Surgical Opinion. The Physician providing the second surgical opinion cannot be financially associated with the referring Physician or assist in the Surgery in order for charges to be considered a Covered Expense under this Certificate.

If the second opinion disagrees with the first, a third opinion will also be considered a Covered Expense.

This benefit is not subject to a Deductible.

**Ambulance Transport**

Covered Expenses include Ambulance transportation to and from a Hospital or other facility qualified to give proper care.

**Transplant Procedures**

Covered Expenses include charges incurred by an Insured Person as a recipient of an organ transplant procedure, while Hospital Confined, provided such transplant procedure is commonly or customarily recognized by the medical profession as appropriate treatment of a Sickness or Injury.

Covered Expenses do not include charges incurred by or relating to an organ donor.

Benefits are not payable for animal organ or artificial organ transplants or for personal hygiene and convenience items, such as air conditioners, humidifiers, hot tubs, whirlpools, or physical exercise equipment, even if a Physician prescribes such items.

**Hospital Bill Audit**

If You find errors in Your medical bills, such as overcharges or charges for services not received, and have them corrected, We will pay a benefit. It will be equal to 50% of any savings We realize because of the resulting reduction in the amount of the Covered Expense. The maximum benefit We will pay for these cost savings is $1000 in any one Injury or Sickness.

## EXCLUSIONS AND LIMITATIONS

**We will not provide any benefits for charges resulting from or in connection with:**

1. Any care not Medically Necessary or charges for which benefits are not specifically provided for in this Certificate;
2. Expenses incurred while not hospital confined, except as specifically provided;
3. Any act of war, declared or undeclared;
4. Suicide, attempted suicide, or any intentionally self-inflicted Injury, while sane or insane;
5. Any routine physical examination, unless otherwise stated herein;
6. Any Injury or Sickness arising out of, or in the course of, employment for wage or profit, provided the Insured Person is covered under any Worker's Compensation Act, Occupational Disease Act, or similar act or law, unless the Insured Person is self-employed;
7. Mental or Nervous Disorders, unless otherwise stated herein;
8. Drug abuse or addiction including alcoholism, or overdose of drugs, narcotics, or hallucinogens, unless taken as prescribed by a Physician;
9. An overdose of drugs, being intoxicated or under the influence of intoxicants, hallucinogens, narcotics or other drugs, unless taken as prescribed by a Physician;
10. Any drug, treatment or procedure that either promotes or prevents conception or prevents childbirth, including but not limited to: (a) artificial insemination; (b) in-vitro fertilization or other treatment for infertility; (c) treatment for impotency; (d) sterilization or reversal of sterilization; or (e) abortion (unless the life of the mother would be endangered if the fetus were carried to term), unless otherwise stated herein;
11. Radial keratotomy or any eye Surgery when the primary purpose is to correct nearsightedness, farsightedness, astigmatism, or any other refractive error;
12. Spinal manipulations and manual manipulative treatment or therapy;
13. Mandibular or maxillofacial Surgery to correct growth defects after one year from the date of birth, jaw disproportions or malocclusions, or to increase vertical dimension or reconstruct occlusion;
14. Weight loss or modification, or complications arising therefrom, or procedures resulting therefrom, or for surgical treatment of obesity, including wiring of the teeth and all forms of Surgery performed for the purpose of weight loss or modification;
15. Breast reduction or augmentation unless necessary in connection with breast reconstructive Surgery following a mastectomy performed while insured under this Certificate;
16. Modification of the physical body in order to improve the psychological mental or emotional well-being of the Insured Person, such as sex-change Surgery;
17. Marriage, family, or child counseling for the treatment of premarital, marriage, family or child relationship dysfunctions;
18. Routine newborn care, unless otherwise stated herein;
19. Engaging in an illegal occupation or illegal activity;
20. Care in a nursing home, custodial institution or domiciliary care or rest cures;
21. Preparation and presentation of medical reports for appearance at trials or hearings. Physical examinations required for school events, camp, employment, licensing and insurance are expressly excluded;
22. Immunizations required for the sole purpose of travel outside of the U.S.A.
23. Payment for care for military service connected disabilities for which the Insured Person is legally entitled to services and for which facilities are reasonably available to the Insured Person and payment for care for conditions that state or local law requires be treated in a public facility;
24. Experimental medical, surgical or other health care procedures, treatments, products or services, unless otherwise stated herein;
25. Personal comfort items, such as television, telephone, lotions, shampoos, etc.;
26. Cosmetic Surgery;
27. Dental Care, treatment or Surgery unless necessitated by Injury to sound natural teeth which occurs while insured under this Certificate. (The expense must be incurred within one year from the date of Injury, and while Hospital Confined or in a Outpatient Surgery Facility);
28. Corrective vision or hearing supplies or for the examination for prescribing or fitting such supplies;
29. The removal of warts, corns, calluses, the cutting and trimming of toenails, care for flat feet, fallen arches or chronic foot strain;

30. Hernia, hemorrhoids, tonsils, adenoids, middle ear disorders, myringotomy; or any disease or disorder of the reproductive organs unless the loss is incurred 6 months after the Insured Person becomes covered under this Certificate;

31. Prescription drug benefits, unless added by rider;

32. Normal pregnancy, except for Complications of Pregnancy, unless added by Rider;

33. Treatment, services or supplies received outside the U.S. or Canada. However, benefits will be payable for Covered Expenses incurred as a result of an acute Sickness or Injury sustained during the first 30 days of travel outside of the U.S. or Canada. In no event will benefits be payable beyond the first 30 days of travel outside of the U.S. or Canada;

34. A Sickness which first manifests itself within 30 days after the Insured Person's coverage becomes effective, until coverage has been in force for a period of one year.

**Pre-Existing Condition**

We will not provide benefits for any loss resulting from a Pre-Existing Condition, as defined, unless the loss is incurred at least one year after the effective date of coverage for an Insured Person.

**Coverage After Age 65 or Earlier Medicare Eligibility**

When an Insured Person attains age 65 or becomes eligible for Medicare, whichever happens first, the benefits of this Certificate and its attachments, if any, are payable only to the extent that Covered Expenses are not paid by Medicare and they would otherwise be payable under this Certificate. The benefits will also be subject to any other EXCLUSIONS AND LIMITATIONS set forth in this Certificate.

## COORDINATION OF BENEFITS

All of the benefits provided under the Group Policy are subject to this provision. However, Coordination of Benefits (COB) may not be applied to claims less than fifty dollars ($50.00). If additional liability is incurred to raise the claim above fifty dollars ($50.00), the entire liability may be included in the COB computation.

**Plan** means any plan providing benefits or services for or by a reason of expenses incurred for hospital, medical, or dental care or treatment, which benefits or services are provided by:

1. Group, association group, or blanket insurance coverage;
2. Group Blue Cross, Blue Shield or other prepayment coverage provided on a group basis;
3. Any coverage under labor-management trustee plans; union welfare plans, self-funded plans, employer organization plans, employee benefit organization plans or any other arrangement of benefits for individuals of a group; any coverage under governmental programs, except Medicaid, and any coverage required or provided by any statute, including no-fault auto insurance.

The term "Plan" shall be construed separately with respect to each policy, contract or other arrangement for benefits or services and separately with respect to that portion of such policy, contract or other arrangement which reserves the right to take the benefits or services of other plans into consideration in determining its benefits and that portion which does not.

**This Plan** refers to provisions of the Group Policy which are subject to this section.

**Allowable Expense** will be any necessary, Usual and Customary Charge, all or part of which is covered by at least one of the Plans covering the Insured Person. Allowable Expenses to a "secondary" plan will include the value or amount of any deductible amount or co-insurance percentage or amount of otherwise Allowable Expenses which is not paid by the "primary" or first paying plan.

Some plans provide benefits in the form of services rather than cash payments. For those plans, the reasonable cash value of each service rendered will be deemed to be both an Allowable Expense and a benefit paid.

**Claim Determination Period** is a Calendar Year or portion thereof during which the Insured Person has been covered under This Plan.

Determination of benefits payable under This Plan and all other applicable Plans will be controlled by this provision, if without this provision the sum of the benefits payable under:

1.   This Plan; and
2.   All other applicable plans,

would exceed the Allowable Expense.

If the sum of 1. and 2. above does exceed the total Allowable Expense, benefits payable under This Plan will be reduced by the amount of benefits payable under all other Plans.

Benefits of any other Plans which contain a COB provision will be ignored when computing the benefits of This Plan if:

1.   The other plan's COB provision states that the benefits will be determined after This Plan computes its benefits; and
2.   The rules set forth below would require This Plan to compute its benefits first.

The rules that set the order of benefit determination are:

1.   A plan that covers the Insured Person other than as a dependent will compute benefits before a plan that covers the Insured Person as a dependent; and
2.   When a dependent is a child covered under separate plans of each parent, the plan covering the parent whose date of birth (month and day) precedes the other in the Calendar Year shall be primary; except:
     a)   where both parents have the same birthday, the benefits of the plan which covered the parent longer are determined before those of the plan which covered the other parent for a shorter period of time; or
     b)   where the parents are separated or divorced and the parent with custody of the child has not remarried, then the plan covering the parent with custody shall be primary; or
     c)   where the parents are divorced and the parent with custody of the child has remarried; then: (i) the plan covering the parent with custody shall be primary, or (ii) the plan covering the step-parent of the child shall be primary to that of the parent without custody; or
     d)   notwithstanding subparagraphs a), b), and c) above, where the parents are divorced or separated and there is a court decree establishing the financial responsibility of medical or other health care expenses with respect to the child of one parent, then the plan covering the parent with the financial responsibility shall be primary; and

3.   If benefit determination order is not established above, the primary plan is the plan which has been in effect the longest except:

     a)   if plan benefits of the Insured Person are based on a laid-off, or retired employee or a dependent of either, then that plan will be secondary to the other plan's benefits. If neither plan has a provision for a laid-off, or a retired employee or a dependent of either and each plan determines benefits after the other, then this subparagraph a) is not applicable.

We reserve the right to release or obtain information that We deem necessary, about any person to or from:

1.   Any other insurance company; or
2.   Any organization or person.

At Our request, the Insured Person shall furnish us with any information needed to determine payment of benefits under this COB provision.

**Facility of Payment**

Whenever benefits which should have been paid under This Plan are paid under any other Plan, We shall have the right to pay to the organization that made the payments any amount that We feel will satisfy this provision. Amounts so paid will be deemed benefits paid under This Plan and We will be fully discharged from liability under This Plan.

**Right of Recovery**

If We, at any time, pay the total Allowable Expense and that amount exceeds the payment required to satisfy the intent of this provision, We will have the right to recover such payments, to the extent of such excess, from among one or more of the following, as We shall determine: any persons to or for or with respect to whom such payments were made; any other insurance companies; any other organization.

**Time Limit for Payment**

Payment of benefits must be made within thirty (30) calendar days after submittal of a proof of loss, unless We provide the claimant a clear and concise statement of a valid reason for further delay which is in no way connected with or caused by the existence of this COB provision nor otherwise attributable to Us.

## GENERAL PROVISIONS

**Entire Contract**

The Entire Contract consists of:

1.  The Group Policy, which includes this Certificate;
2.  The application of the Group Policyholder, which will be attached to the Group Policy;
3.  Any enrollment applications for the proposed Insured Individuals; and
4.  Any endorsements, amendments or riders attached.

All statements made by the Group Policyholder or by You will, in the absence of fraud, be deemed representations and not warranties.

Only Our President, a Vice President or Secretary has the power on Our behalf to execute or amend the Group Policy. No other person will have the authority to bind Us in any manner. No agent may accept risks, alter or amend coverage or waive any provisions of the Group Policy. Any change in the Group Policy will be made by amendment approved by the Group Policyholder and signed by Us. Such amendment will not require the consent of any Insured Person.

**Notice of Claim**

Written notice of claim must be given to Us within 20 days, or as soon as reasonably possible. Written notice of claim given by or on behalf of the Insured Person to Us with information sufficient to identify such person will be considered notice to Us.

**Claim Forms**

When We receive the notice of claim, We will send the Insured Person forms for filing proof of loss. If these forms are not furnished within 15 days, the Insured Person will meet the proof of loss requirements by giving Us a written statement of the nature and extent of the loss within the time limit stated in the next provision.

**Proof of Loss**

Written proof of loss must be furnished to Us at Our administrative office in North Richland Hills, Texas, within 90 days after the date of the loss for which claim is made. Failure to furnish written proof of loss within that time will neither invalidate nor reduce any claim if it is shown that it was not reasonably possible to furnish written proof of loss within that time; provided such proof is furnished as soon as reasonably possible and in no event, in the absence of legal incapacity, later than one year from the time proof is otherwise required.

**Claim Payments**

We will pay all benefits due under the Group Policy promptly upon receipt of due proof of loss.

All benefits are payable to You, however, at Our Option, We may pay the provider of service instead, unless You have requested otherwise in writing prior to providing proof of loss. If any such benefits remain unpaid at Your death, or if You are, in Our opinion, incapable of giving a legally binding receipt for payment of any benefit, We may, at Our option, pay such benefit to Your estate or any one or more of the following relatives: Your spouse; mother, father, child or children; brother or brothers; sister or sisters. Any payment so made will constitute a complete discharge of Our obligations to the extent of such payment.

**Physical Examination**

We will, at Our own expense, have the right and opportunity to examine the Insured Person whose Injury or Sickness is the basis of a claim when and as often as We may reasonably require during the pendency of a claim and to make an autopsy in case of death, unless prohibited by law.

**Legal Action**

No action at law or in equity will be brought to recover on the Group Policy prior to the expiration of 60 days after proof of loss has been filed as required by the Group Policy; nor may any action be brought after the expiration of 3 years after the time written proof of loss is required to be furnished.

**Age Misstatement**

If the age of any Insured Person has been misstated, Our records will be changed to show the correct age. The benefits provided will not be affected if the Insured Person continues to be eligible for coverage at the correct age. However, premium adjustments, including collection of any premium due Us because of past underpayments, will be made so that We receive the premiums due at the correct age payable on the premium due date following Our notification of an age correction.

**Incontestability**

After 2 years from the Insured Person's Effective Date of Coverage, no misstatements, except fraudulent misstatements, made in the enrollment application will be used to void the coverage, or deny a claim unless the loss was incurred during the first 2 years following such Insured Person's Effective Date of Coverage.

No claim for a loss incurred one year after an Insured Person's Effective Date of Coverage will be reduced or denied as a Pre-Existing Condition.

**Conformity**

Any provision of this Certificate which, on the Effective Date of Coverage, is in conflict with the extraterritorial statutes of the state in which You reside on such date, is hereby amended to conform to the minimum requirements of such statutes.

**Change of Residence**

If You move, You must notify the Company. Only the extraterritorial benefits mandated by the State in which You reside will be considered Covered Expenses under this Certificate. An Insured Person must be a permanent resident of the United States in order to remain eligible for insurance under this Certificate.

**Subrogation**

You agree that We shall be subrogated to Your right to damages, to the extent of the benefits provided by the Certificate, for Injury or Sickness that a third party is liable for or causes. You agree to repay Us first out of any monies You obtain regardless of the amount that You recover. In the event that We retain Our own attorney to represent Our subrogation interest, We will not be responsible for paying a portion of Your attorney fees or costs.

You assign to Us Your claim against a liable party to the extent of Our payments, and shall not prejudice Our subrogation rights. Entering into a settlement or compromise arrangement with a third party without Our prior written consent shall be deemed to prejudice Our rights. You shall promptly advise Us in writing whenever a claim against another party is made and shall further provide to us such additional information as is reasonably requested by Us. You agree to fully cooperate in protecting Our rights against a third party.

**Right of Reimbursement**

You may receive benefits under the Group Policy, and may also recover losses from another source, including Workers' Compensation, uninsured, underinsured, no-fault or personal injury protection coverages. The recovery may be in the form of a settlement, judgement, or other payment.

You must reimburse Us from these recoveries in an amount up to the benefits paid by Us under the Group Policy. You agree to repay us first out of any monies You obtain regardless of the amount that You recover. We have an automatic lien on any recovery.

## Mid-West National Life Insurance Company of Tennessee

A Stock Company
(Hereinafter called: the Company, We, Our or Us)
Home Office: Oklahoma City, Oklahoma
Administrative Office: P.O. Box 982010
North Richland Hills, Texas 76182-8010
Customer Service: 1-800-733-1110

## AMBULATORY CARE RIDER

This Rider is made a part of the Group Policy and Certificate to which it is attached. The Rider is subject to all provisions, terms, DEFINITIONS and EXCLUSIONS AND LIMITATIONS of the Group Policy and Certificate which are not inconsistent with the provisions of this Rider.

The benefits provided by this Rider will not duplicate the benefits provided under the Certificate and any other rider and are subject to the maximum benefit amount and Coinsurance, the Copayment and the Lifetime Maximum Benefit Amount shown for this Rider in the CERTIFICATE SCHEDULE.

Covered Expenses incurred under this Rider will not be considered a Covered Expense under the Certificate and are not subject to and will not be used to satisfy the Certificate Deductible.

**COVERED EXPENSES**

We will pay benefits for Covered Expenses incurred by an Insured Person, while not Hospital Confined, while this Rider is in force, for:

1. Diagnostic x-rays and interpretations charges;
2. Laboratory and pathological examinations, and
3. Physical, Occupational, Speech Therapy (preceded by Hospital Confinement or Surgery and not received during Hospital Confinement);

while not Confined to a Hospital and that are related to and necessary for the diagnosis and treatment of a Sickness or Injury. Benefits under this Rider include, but are not limited to, Covered Expenses incurred for:

| | |
|---|---|
| CAT Scans | Magnetic Resonance Imaging (MRI) |
| Electrocardiogram (EKG) | Blood or serum analysis |
| Angiogram | Stress Tests |
| Upper/Lower G.I. Series | |

Under this Rider, Copayment means the amount the Insured Person is required to pay for specifically listed Covered Expenses before any benefits are payable and before application of the Coinsurance and/or maximum benefits. The Copayment for this Rider is shown in the CERTIFICATE SCHEDULE. Copayments and Coinsurance under this Rider do not count toward Deductibles or Coinsurance Maximums under the Certificate.

DUPLICATE

RMRIL04001

**LIMITATIONS AND EXCLUSIONS**

In addition to the EXCLUSIONS and LIMITATIONS of the Certificate, We will not pay benefits under this Rider for:

1. Diagnostic surgical procedures;
2. Physician's office visit or clinic charges, Hospital emergency room charges, Outpatient facility charges, Outpatient Surgery Facility charges or any other facility charges associated with the above Covered Expenses;

3. Pre Existing conditions as defined in the Certificate;
4. Physical examinations or checkups;
5. Prescription drugs and medicines;
6. Radiation or chemotherapy for the purpose of modification or destruction of cancerous tissue;
7. Any test, procedures or services related to pregnancy or childbirth unless Medically Necessary due to Complications of Pregnancy, as defined in the Certificate.

We will provide this benefit in consideration of the payment of the required premium for this Rider.

Rider effective date, if different from Certificate Date: <u>06/21/2005</u>

**MID-WEST NATIONAL LIFE INSURANCE COMPANY OF TENNESSEE**

SECRETARY                    PRESIDENT